1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SHARKS SPORTS & ENTERTAINMENT LLC, | Case No. 18-CV-04060-LHK |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| FEDERAL TRANSIT ADMINISTRATION, et al., | Re: Dkt. Nos. 86, 89 |
| Defendants. | |

Plaintiff Sharks Sports & Entertainment LLC ("Sharks Sports") bring the instant lawsuit against Defendants Federal Transit Administration ("FTA"), Acting Administrator of FTA K. Jane Williams, Acting Regional Administrator of FTA Region IX Edward Carranza Jr., and Secretary of the United States Department of Transportation Elaine L. Chao (collectively "FTA" or "Defendants"). Plaintiff alleges that the FTA violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") when the FTA issued a Record of Decision on June 4, 2018 that announced that environmental requirements had been satisfied for the Bay Area Rapid Transportation Silicon Valley Phase II Extension Project.

Having considered the submissions of the parties, the relevant law, and the record in this

1

United States District Court
Northern District of California

case, the Court hereby DENIES Sharks Sports' motion for summary judgment and GRANTS the

FTA's motion for summary judgment.

## I.       BACKGROUND

### A.   Factual Background

#### 1.   NEPA Requirements

The National Environmental Policy Act ("NEPA") requires a federal agency to prepare an

environmental impact statement for any "major Federal action[] significantly affecting the quality

of the human environment." 42 U.S.C. § 4332(2)(C). NEPA also applies to state transportation

projects with significant federal funding. *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1101 (9th Cir.

2007). The environmental impact statement must include a detailed statement regarding, *inter*

*alia*: (i) "the environmental impact of the proposed action"; (ii) "any adverse environmental

effects which cannot be avoided should the proposal be implemented"; and (iii) "alternatives to the

proposed action." 42 U.S.C. § 4332(2)(C). If an agency determines that an environmental impact

statement is necessary, the agency must first prepare a draft environmental impact statement. 40

C.F.R. § 1502.9(a). The agency must then release the draft environmental impact statement to the

public and to other agencies for comment. *Id.* § 1503.1(a). After the public comment period

concludes, the agency prepares a final environmental impact statement, in which the agency must

respond to comments made during the draft environmental impact statement comment period. *Id.*

§ 1502.9(b). After the final environmental impact statement is released, the agency has the option

to request comments before making a final decision. *Id.* § 1503.1(b).

If the agency "makes substantial changes in the proposed action that are relevant to

environmental concerns" or if there are "significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts," then the agency must

also prepare a supplemental draft environmental impact statement or final environmental impact

statement. *Id.* § 1502.9(c).

Upon issuance of a decision, the agency ultimately produces a record of decision ("ROD")

2

that explains the rationale for the agency's decision. *Id.* § 1505.2. The ROD must include an assessment of all practicable measures for mitigating environmental harm. *See id.* § 1505.2(c).

### 2. Project Overview

The instant case concerns the Santa Clara Valley Transit Authority's ("VTA") Bay Area Rapid Transportation Silicon Valley Program ("Extension Program"). The Extension Program consists of a 16-mile transit extension from the Bay Area Rapid Transportation's ("BART") Warm Springs Station in southern Fremont into Santa Clara County through the cities of Milpitas, San Jose, and Santa Clara. FTA 25.[1] The Extension Program[2] is divided into two phases: the Phase I Berryessa Extension Project ("Phase I Project") and the BART Silicon Valley Phase II Extension Project ("Phase II Project"). *Id.* The FTA provided financial assistance for the Extension Program, and the VTA is charged with carrying out the engineering and construction of the Extension Program. *Id.* The FTA is the lead agency for NEPA purposes, and VTA is the lead agency for the California Environmental Quality Act ("CEQA") process. *Id.*

In June 2010, the FTA issued the ROD for the Phase I Project, a 10-mile extension of the BART system into Milpitas and into northern San Jose. FTA 25, 214–69. The Phase II Project, a further 6-mile extension of the BART system into San Jose and Santa Clara, is the subject of a combined joint Supplemental Environmental Impact Statement/Supplemental Environmental Impact Report ("Final SEIS/SEIR"), adopted in February 2018. *See* FTA 20626–22111 (Volume I of the Final SEIS/SEIR). In June 2018, the FTA issued the ROD for the Phase II Project under NEPA. FTA 25–187.

The purpose of the Phase II Project is to "improve transit services and boost intermodal connectivity" in the region. FTA 25, 27, 20738. The Phase II Project would increase transit trips within Alameda and Santa Clara counties, as well as neighboring counties and portions of the Central Valley. FTA 25–26. The Phase II Project would also improve transit services and

---

[1] Citations to the administrative record are in the form, "FTA XX."
[2] The Extension Program was previously called the "Silicon Valley Rapid Transit Corridor Project." FTA 26.

3

options, enhance regional connectivity, improve mobility options, and maximize transit usage and ridership in order to reduce automobile traffic and related air quality emissions. FTA 26 and 30–31.  The Court provides additional details concerning the Phase I Project and the Phase II Project as relevant below.

### 3.  The Phase I Project

#### a.  2001-2003: The VTA Considers Eleven Alternatives.

In 2001, the VTA initiated a Major Investment Study of various transportation options for the Extension Program.  FTA 26, 440, 506, 31024–130.  The VTA identified eleven possible alternatives that could address the project's goals.  FTA 26, 486, 31042–70.  In November 2001, the VTA approved a locally preferred alternative that would extend BART service from Fremont to Santa Clara through Milpitas and San Jose. FTA 26, 486, 31032–33.

#### b.  2004: The Draft EIS/EIR and Final EIR.

In 2004, the FTA and the VTA prepared a combined Draft EIS/EIR for the entire 16-mile Extension Program ("2004 Draft EIS/EIR").  FTA 26, 439, 781–1533.  The 2004 Draft EIS/EIR listed "[p]arking spillover into communities at BART station sites" as an "area of controversy." FTA 836.  The 2004 Draft EIS/EIR listed two options for the location of the proposed BART Diridon Station ("Diridon Station") (a North Option and South Option), and stated that "two large, multi-level parking structures" would be built to "replace lost parking" and to "add 1,500 to 2,200 new park-and-ride spaces for the BART station."  FTA 882.  Diridon Station already exists and is a "multi-modal transportation center within the City of San Jose's downtown urban core."  FTA 20987.  Diridon Station is currently "served by several transit modes including VTA's Light Rail and express and local bus service, ACE, Amtrak, Capitol Corridor, and regional bus lines to Alameda and Santa Cruz County."  *Id.*  The Extension Program would make Diridon Station a BART station as well.  The 2004 Draft EIS/EIR projected "park-and-ride demand" at the various BART stations, including Diridon Station.  FTA 924–25.  Pursuant to that model, the 2004 Draft EIS/EIR anticipated a parking demand of 2,056 spaces at Diridon Station.  FTA 925.  The Diridon

4

United States District Court
Northern District of California

1   Station parking structures were slated to create 2,262 new parking spaces, which exceeded the

2   modeled park-and-ride demand.  *Id.*

3       After the public review period of the 2004 Draft EIS/EIR, the VTA chose to pursue federal

4   and state environmental clearance on independent paths.  FTA 1711.  Moreover, a NEPA Notice

5   of Intent to prepare an environmental impact statement was published for the BART extension to

6   the proposed Warm Springs Station.  FTA 26.  This Warm Springs project served as a required

7   precursor to the broader Extension Program because it would serve as a "critical link between the

8   existing BART system" and the Extension Program.  *Id.*  The remainder of the Extension Program

9   was not ripe for NEPA review, as it was in early planning stages.  *Id.*  As a result, VTA withdrew

10  the Extension Program from FTA's New Starts qualification and funding program.  *Id.*

11      Meanwhile, the VTA continued the CEQA process for the Extension Program.  FTA 440.

12  Thus, in December 2004, the VTA issued a 2004 Final Environmental Impact Report ("2004 Final

13  EIR") that discussed the Extension Program and responded to comments.  FTA 2528–2978.  The

14  2004 Final EIR was certified only by the VTA, not the FTA.  FTA 2495 (noting that 2004 Final

15  EIR was prepared pursuant to CEQA by the VTA).  The 2004 Final EIR contained the same

16  parking projections that had been included in the 2004 Draft EIS/EIR.  FTA 3000.  In a letter, the

17  SAP Center[3] raised concerns about parking at Diridon Station, but stated that "we continue to be

18  excited about potential benefits of this project in enhancing accessibility for HP Pavilion and for

19  other uses in downtown San Jose."  FTA 2772–75.  The VTA responded that because the parking

20  structures at Diridon Station were slated to create 2,262 parking spaces, "there would be no

21  adverse long-term parking impacts at the Diridon Station."  FTA 2779.

          **c.   2007: The Final SEIR.**

23      In January 2007, the VTA published a Final Supplemental EIR ("2007 Final SEIR").  FTA

24  3058–3698.  The 2007 Final SEIR updated the 2004 Final EIR and analyzed the environmental

25  impacts of several proposed design changes, including changes to Diridon Station.  One such

26

27  [3] The SAP Center was previously named HP Pavilion.

28  Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

change was the addition of a "No Parking Option" to Diridon Station.  FTA 3083.  Indeed, the 2007 Final SEIR identified two parking options at the Diridon Station: a Parking Structure Option, which included a four-level parking structure of 1,320 spaces, and a No Parking Option, in which no parking structure at Diridon Station would be built.  FTA 3157.  In the event of the No Parking Option, "additional parking would be provided at the Santa Clara Station."  *Id.*  The 2007 Final SEIR ultimately did not identify a preferred option for Diridon Station parking.  FTA 3705.  Moreover, the 2007 Final SEIR adjusted the 2030 projected park-and-ride demand for Diridon Station down from the 2,262 listed in the 2004 Final EIR to either 1,313 or 1,319, depending on whether an additional BART station was constructed in Calaveras.  FTA 4116.

During the comment period, the SAP Center commented on both the reduction of the park-and-ride demand, as well as the addition of the No Parking Option.  FTA 3965.  As to the first issue, the VTA explained that "parking demand at the Diridon/Arena Station is less than what was projected in the 2004 FEIR.  One key reason is the use of ABAG's 2003 'Smart Growth' Land Use Projections that assume intense development in downtown areas and future transit stations.  The Diridon/Arena Station is assumed to evolve into a downtown type of station supporting high-rise office development.  Downtown stations, especially because they are congested, do not typically support park-and-ride demand."  FTA 3967.

Further, as to the No Parking Option, the VTA explained that "[t]he proposed Diridon/Arena Station provides excellent intermodal transfer opportunities between many rail and bus transit lines. The station also offers many opportunities for future high-density transit-oriented developments.  VTA's position is that it will be more cost-effective to encourage transit connections and development opportunities, rather than build a parking structure.  By providing no parking, there is no expectation of finding parking at the Diridon/Arena Station.  If parking spill over were to occur, the City of San Jose could consider a parking management plan that could include a number of strategies including a permit program."  *Id.*

In mid-2007, the VTA requested the FTA's approval to begin the NEPA process again for

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1    the Extension Program.  FTA 26.  Thus, on September 21, 2007, the FTA published a Notice of

2    Intent to prepare an environmental impact statement for the Extension Program in the Federal

3    Register.  *Id.*

### d.   2010: Final EIS and Phase I ROD.

5         In March 2009, a Draft EIS ("2009 Draft EIS") was released for comment.  FTA 4149–

6    4276.  A year later, in March 2010, the VTA and FTA published a Final EIS ("2010 Final EIS")

7    that examined the environmental impact of three different alternatives: the Berryessa Extension

8    Project ("BEP"), which would extend BART roughly ten miles and complete Phase I of the

9    Extension Program; the Silicon Valley Rapid Transit Project ("SVRTP"), which would extend

10   BART roughly sixteen miles and complete Phases I and II of the Extension Program; and a no

11   build alternative.  FTA 4717.

12        Insofar as the Final EIS examined the SVRTP alternative, the 2010 Final EIS contemplated

13   that Diridon Station would be built with an "eight-level parking structure for approximately 1,300

14   spaces."  FTA 4997.  However, the Final EIS explained that in 2030, unconstrained parking

15   demand at Diridon Station was projected to be for 2,585 parking spaces.  *Id.*  The 2010 Final EIS

16   explained that "[c]onstruction of additional single purpose user parking facilities would not be

17   consistent with the City of San Jose's Master Plan for the Diridon area, which includes high-

18   density residential and commercial redevelopment."  *Id.*  Accordingly, the 2010 Final EIS

19   contemplated numerous mitigation proposals to handle the excess unconstrained parking demand,

20   such as a transit area plan that could encourage transit-supportive access to the area and non-auto

21   travel, as well as leasing options.  *Id.*

22        However, the FTA ultimately recommended that the VTA proceed with the BEP

23   alternative, not the SVRTP.  FTA 2717.  The BEP alternative did not include Diridon Station, and

24   included only a ten-mile extension of BART from Warm Springs to Berryessa.  *Id.*  Accordingly,

25   on June 24, 2010, the FTA issued the ROD for the BEP, which comprised the Phase I Project of

26   the full Extension Program.  *Id.*  The remaining six miles of the Extension Program, including the

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    construction of Diridon Station, was relegated to the Phase II Project.

2        **4. The Phase II Project**

3        The VTA turned to the Phase II Project of the Extension Program several years later. In

4    2013, the VTA sent letters to several other state agencies that updated the agencies on the Phase II

5    Project under consideration. FTA 37564–67. The VTA explained that under the new version of

6    the Phase II Project under consideration, there were two potential BART locations at Diridon

7    Station: a Diridon Station East Option and a Diridon Station West Option. FTA 37564.

8    Moreover, the VTA explained that "[n]o parking is proposed for either the East or West options at

9    Diridon Station." *Id.*

10        **a. 2015–2016: Environmental Scoping Report and 2016 Draft SEIS/SEIR.**

11        In May 2015, the FTA and the VTA issued an Environmental Scoping Report as to the

12    Phase II Project of the Extension Program. FTA 8168–8571. In the description of the Phase II

13    Project, the Environmental Scoping Report stated that "[f]our stations are proposed as part of this

14    Phase II Project: three in San Jose (Alum Rock, Downtown San Jose, and Diridon Stations), and

15    one in Santa Clara (Santa Clara Station)." FTA 8175. The Environmental Scoping Report

16    indicated that only Alum Rock Station and Santa Clara Station would have parking structures. *Id.*

17    Diridon Station would only have a "'kiss-and-ride' (passenger drop-off) facilit[y]." *Id.* The

18    Environmental Scoping Report summarized key issues that were raised at three in-person scoping

19    meetings as well as in the form of comments received by VTA in the mail or through email. FTA

20    8184. Several "key issues" concerned the prospect of parking at Diridon Station. For instance,

21    the Environmental Scoping Report listed "Consider parking structures at Diridon Station," and

22    "Do not provide parking at Diridon Station" as comments that had been raised in connection with

23    the Environmental Scoping Report. FTA 8186–87.

24        In December 2016, the VTA and FTA then issued a Draft Supplemental EIS/EIR ("2016

25    Draft SEIS/SEIR"). FTA 8572–9219. The 2016 Draft SEIS/SEIR proposed that the Phase II

26    Project consist of a 6-mile BART extension from Berryessa Station into Santa Clara, with three

27

28    Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

stations in San Jose (Alum Rock/28th Street, Downtown San Jose, and Diridon Station), and a station and a maintenance facility in Santa Clara.  FTA 29, 8572–9219.

The 2016 Draft SEIS/SEIR also included a Transit Oriented Joint Development ("TOJD") alternative proposed by the VTA for several stations.  FTA 27–28, 8604.  The TOJD would involve VTA working with a private developer to develop mixed-use developments at each of the BART stations.  FTA 8722.  The proposed TOJD was not part of the NEPA Build Alternative, because it was an independent action by VTA, and no federal action was involved.  FTA 27–28. However, the 2016 Draft SEIS/SEIR analyzed the TOJD component as part of the cumulative impact analysis under NEPA.  FTA 27.

The 2016 Draft SEIS/SEIR contemplated two BART station location options for Diridon Station: the Diridon Station South Option and the Diridon Station North Option. FTA 8706–09. Under either option,"[n]o park-and-ride parking would be provided." FTA 8706, 8708.

### b.  2018: 2018 Final SEIS/SEIR.

A Final Supplemental EIS/EIR was published in February 2018 ("Final SEIS/SEIR") and explained that several purposes of the Extension Program were to: (1) "[i]mprove public transit service"; (2) "[s]upport transportation solutions" that "reduc[e] reliance on single auto commute trips"; and (3) [s]upport local and regional land use plans."  FTA 20738.  The Final SEIS/SEIR included several changes to Diridon Station's configuration and concepts.  FTA 20662, 20803. With respect to parking, the Final SEIS/SEIR noted that for Diridon Station, under either the North and South Options, "No [park-and-ride] parking would be provided," and no parking structures would be built.  FTA 20796, 20804.

The Final SEIS/SEIR examined the impact of the Extension Program on the area surrounding Diridon Station.  The Final SEIS/SEIR noted that "Diridon Station is an existing multi-modal transportation center located within the City of San Jose's downtown urban core." FTA 20987.  The BART station at Diridon Station area was projected to function "more as a destination station in the AM commute direction, as patrons travel to nearby activity centers, than

9

United States District Court
Northern District of California

1    as an origin station." *Id.*

2        The 2018 Final SEIS/SEIR discussed parking impacts.  For instance, the 2018 Final

3    SEIS/SEIR concluded that the Extension Program would not interfere with activities at the SAP

4    Center notwithstanding the fact that Diridon Station would not provide parking.  FTA 20980.  The

5    Final SEIS/SEIR also indicated that ridership modeling showed that without parking at Diridon

6    Station, auto-based BART trips would shift to Alum Rock and Santa Clara Stations, which would

7    provide parking.  FTA 20846.  Moreover, based on the ridership modeling, building a parking

8    structure at Diridon Station would lead to a nominal increase in overall ridership, 19 passengers or

9    0.0004 percent.  *Id.*  The Final SEIS/SEIR opined that the benefits to overall BART ridership did

10   not outweigh the cost of construction.  *Id.*

11       In response to public comments, the Final SEIS/SEIR explained how short-term impacts

12   were addressed under NEPA, and how such impacts would be mitigated.  FTA 22131–40.  Some

13   comments asserted that Phase II should be re-designed to provide parking for BART riders using

14   Diridon Station.  FTA 22136.  The Final SEIS/SEIR indicated that access to Diridon Station

15   would be "almost entirely (91 percent) by walk/bicycle, heavy and light rail transit, and bus." FTA

16   20985.  The Final SEIS/SEIR also acknowledged that the 2010 EIS had assumed that 44 percent

17   of the ridership would access Diridon Station via park-and-ride.  FTA 22138.  However, the 2018

18   Final SEIS/SEIR argued that new policies and background conditions had resulted in changed

19   assumptions about ridership and parking demand.  *Id.*; FTA 20847–48.

20       With respect to the SAP Center's concern about the permanent loss of parking, the Final

21   SEIS/SEIR argued that Alum Rock Station and Santa Clara Station could provide parking for SAP

22   Center attendees during events, and that parking at those two stations be similar in the number and

23   distance as those parking resources at other event facilities.  FTA 20987–90, 22140–42.  The Final

24   SEIS/SEIR also indicated that it expected many patrons to use BART to access the SAP Center,

25   thereby reducing parking demand.  FTA 22142.  The Final SEIS/SEIR pointed to other event

26   centers that rely on nearby transit, such as Oakland Coliseum and Oracle Arena, among others,

27

28

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

which the Final SEIS/SEIR argued supports the conclusion that parking demand at the SAP Center would likely be reduced through the availability of BART.  FTA 22141.  The Final SEIS/SEIR also relied on a 2017 Parking Inventory by Kimley Horn (the "2017 Parking Inventory"), which found that there are "approximately 14,450 publicly-available parking spaces located within 0.5 mile of Diridon Station."  FTA 20987–88, 36634–39.

The Final SEIS/SEIR ultimately concluded that the Phase II Project would not have adverse long-term or indirect parking impacts.  *Id.*  Based on the Final SEIS/SEIR, the FTA and the VTA approved the Phase II Project with no parking component at Diridon Station.  On June 4, 2018, FTA issued a ROD under NEPA for the Phase II Project, based on the SEIS portion of the Final SEIS/SEIR.  FTA 25–187.

**B. Procedural History**

On July 6, 2018, Sharks Sports filed the instant complaint, which alleges two causes of action: (1) failure to adequately assess and disclose environmental impacts under NEPA and the APA; and (2) failure to supplement the Final SEIS/SEIR.  ECF No. 1 ("Compl.").[4]

On September 21, 2018, the parties stipulated to extend the deadline for the FTA to respond to the complaint to October 24, 2018.  ECF No. 17.  On October 18, 2018, the parties stipulated to further extend the FTA's deadline to respond to the complaint to February 6, 2019.  ECF No. 27.

On January 16, 2019, upon the request of the FTA and with the non-opposition of Sharks Sports, the Court then administratively stayed the instant case pending the government shutdown.  ECF No. 38.  The Court lifted the stay on February 6, 2019.  ECF No. 41.  The Court also granted the parties' stipulation to continue the case schedule, which included continuing the FTA's deadline to respond to the complaint to April 10, 2019.  *Id.*  On April 3, 2019, upon the request of

---

[4] Several months before the instant case, on May 3, 2018, Sharks Sports filed a parallel lawsuit in California Superior Court for the County of Santa Clara, *Sharks Sports & Entertainment LLC v. Santa Clara Valley Transportation Authority*, No. 18-CV-327687 (Cal. Sup. Ct. 2018), which alleges violations of the CEQA.  That parallel lawsuit is ongoing.

the parties, the Court again continued the case schedule, which included continuing the FTA's deadline to respond to the complaint to June 12, 2019.  ECF No. 47.  The FTA filed an answer on June 11, 2019.  ECF No. 52.  On July 26, 2019, the FTA then filed an amended answer.  ECF No. 53.

On September 23, 2019, the FTA served the administrative record on Sharks Sports and lodged a copy with the Court.  ECF No. 62.  On December 6, 2019, Sharks Sports then filed a motion to compel supplementation and completion of the administrative record.  ECF No. 68.  On January 31, 2020, United States Magistrate Judge Susan van Keulen denied in part the motion to compel supplementation and completion of the administrative record, and ordered the parties to meet and confer as to the remaining requests.  ECF No. 79.  Magistrate Judge van Keulen ordered that "any remaining dispute must be presented to the undersigned in a joint letter brief filed no later than **noon on February 7, 2020**."  *Id.* at 19 (emphasis in original).  On February 13, 2020, Sharks Sports moved for relief from Judge van Keulen's January 31, 2020 order based on the exclusion of certain deposition testimony and emails, ECF No. 83, and this Court denied the motion for relief on February 19, 2020, ECF No. 84.

On February 21, 2020, Sharks Sports filed a motion for summary judgment.  ECF No. 86 ("Sharks Mot.").  On March 27, 2020, the FTA filed a cross-motion for summary judgment and opposition to Sharks Sports' motion for summary judgment.  ECF No. 89 ("FTA Mot.").  On April 17, 2020, Sharks Sports filed an opposition to the FTA's cross-motion for summary judgment and reply in support of Sharks Sports' motion for summary judgment.  ECF No. 92 ("Sharks Opp'n").  Finally, on May 1, 2020, the FTA filed a reply in support of the FTA's cross-motion for summary judgment and surreply in opposition to Sharks Sports' motion for summary judgment.  ECF No. 94.

On April 15, 2020, after both of the foregoing cross-motions for summary judgment had already been filed and two days before Sharks Sports' final summary judgment brief was due, the parties filed a joint case management statement.  ECF No. 90.  In that joint case management

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

statement, Sharks Sports stated for the first time that Sharks Sports lacked the ability to read the

travel demand raw data because Sharks Sports "believe[d] that the information is inaccessible

without Hexagon's program necessary to read the information." *Id.* at 3.  Sharks Sports asserted

that Sharks Sports had been "unable to review the information and must either [*sic*] be able to do

so as soon as possible so the relevant information can be filed to complete the record." *Id.*

The Court construed Sharks Sports' statement as a renewed motion to compel completion

or supplementation of the administrative record.  ECF No. 91 at 2.  The Court explained that

Sharks Sports' request was "extremely untimely." *Id.*  The Court noted that "Judge van Keulen

clearly ordered the parties to present 'any remaining dispute' related to the data in question to the

Court by 'no later than **noon on February 7, 2020**.' ECF No. 79 at 19 (emphasis in original)."

*Id.*  Notwithstanding this instruction, Sharks Sports "utterly failed" to raise the issue for two

months. *Id.*  The Court noted that even when Sharks Sports did raise the issue, Sharks Sports only

did so "in the context of a mandatory joint case management statement, not in a formal motion."

*Id.*  Sharks Sports "provide[d] no justification for the lengthy delay." *Id.*

The Court also explained that Sharks Sports' request would be "highly prejudicial." *Id.* at

3.  The Court noted that Sharks Sports "filed a motion for summary judgment on February 21,

2020.  Defendants filed a cross-motion for summary judgment and opposition on March 27, 2020.

Plaintiff's reply and opposition [were] due tomorrow, on April 17, 2020.  After that, the sole

remaining filing on the cross-motions for summary judgment, Defendant's reply, [was] due on

May 1, 2020." *Id.* (citations omitted).  Accordingly, Sharks Sports' "request would require

fundamental modifications to the briefing schedule at the eleventh hour, when summary judgment

briefing [was] already almost entirely complete." *Id.*  The Court therefore denied Sharks Sports'

renewed motion and noted that "Judge van Keulen concurs in the Court's ruling on this issue." *Id.*

## II.      LEGAL STANDARD

### A.  National Environmental Policy Act

NEPA is a procedural statute that is designed to ensure that agencies consider both the

13

United States District Court
Northern District of California

1   environmental impacts of a proposed action, and reasonable alternatives, before proceeding with a

2   federal action.  42 U.S.C. §§ 4321 *et seq.*  NEPA aims to foster informed decision making and

3   public participation by making relevant environmental information available to both the agency

4   and the interested public.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

5   (1989).  To that end, NEPA does not mandate particular results, but establishes procedural

6   requirements for assessing the significant environmental impacts of a decision.  *Winter v. Nat.*

7   *Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (citing *Robertson*, 490 U.S. at 349–50).

8          In reviewing agency decisions under NEPA, the court's role is "simply to ensure that the

9   agency has adequately considered and disclosed the environmental impact of its actions and that

10  its decision is not arbitrary or capricious."  *Baltimore Gas & Elec. Co. v. Natural Res. Def.*

11  *Council*, 462 U.S. 87, 97-98 (1983); *see Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d

12  1105, 1110 (9th Cir. 2015).  The reviewing court looks to ensure that an environmental impact

13  statement has taken a "hard look" at the environmental impacts of the proposed action and has

14  considered a reasonable range of alternatives that achieve the agency's purpose and need for

15  action.  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing

16  *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)); 40

17  C.F.R. § 1502.14.  The Court considers whether "the decision was based on consideration of the

18  relevant factors and whether there has been a clear error of judgment."  *Westlands Water Dist.*,

19  376 F.3d at 865.  The Court performs a limited review, and the Court cannot substitute its

20  judgment for that of the agency.  *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009).

21         The Ninth Circuit has described the standard of review as "highly deferential, presuming

22  the agency action to be valid and affirming the agency action if a reasonable basis exists for its

23  decision."  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir.

24  2016) (internal quotation marks omitted).  The Court's role is to determine whether the agency

25  "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a

26  'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of*

27

28  Case No. 18-CV-04060-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT

*United States District Court*
*Northern District of California*

14

1   *U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The agency's action "need

2   only be a reasonable, not the best or most reasonable, decision."  *River Runners for Wilderness v.*

3   *Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam) (citation omitted).  Judicial review is

4   generally limited to the administrative record.  *San Luis & Delta-Mendota Water Auth. v. Locke*,

5   776 F.3d 971, 992 (9th Cir. 2014).

6   **B.  Summary Judgment under the Administrative Procedure Act**

7   Under the APA, it is the plaintiff's burden to show that the challenged agency action was

8   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

9   706(2)(A); *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004); *Kleppe v. Sierra Club*,

10  427 U.S. 390, 412 (1976).  Judicial review under the arbitrary and capricious standard is "very

11  narrow and highly deferential to the agency," with a presumption in favor of finding the agency

12  action valid.  *Nat'l Wildlife Fed'n v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

13  A reviewing court must simply determine whether the agency decision is "founded on a

14  rational connection between the facts found and the choices made."  *River Runners for Wilderness*,

15  593 F.3d at 1070.  A court may "reverse a decision as arbitrary and capricious only if the agency

16  relied on factors Congress did not intend it to consider, entirely failed to consider an important

17  aspect of the problem, or offered an explanation that runs counter to the evidence before the

18  agency or is so implausible that it could not be ascribed to a difference in view or the product of

19  agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)

20  (quotations omitted), *overruled on other grounds by Winter*, 555 U.S. 7. The task of a reviewing

21  court is simply "to insure a fully informed and well-considered decision," not necessarily the

22  decision the court would have reached as a "member of the decision-making unit of the agency."

23  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978).  If the

24  record before the agency does not support the agency action, the appropriate remedy is to remand.

25  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citations omitted).

26  **III.   JUDICIAL NOTICE**

27

28

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Sharks Sports aseeks judicial notice of two documents: (1) Policy Advisory Board Meeting Minutes, dated April 25, 2007, and (2) the City of San Jose 2019 General Plan Amendments, Long Range Impact Analysis, dated August 29, 2019.  ECF No. 86-1.  The Court DENIES the requests for judicial notice.

As for the Policy Advisory Board Meeting Minutes, the Court previously denied Sharks Sports' request to complete or supplement the administrative record with this document.  ECF No. 79 at 12–13.  Specifically, Sharks Sports failed to provide any "evidence that FTA considered the document, either directly or indirectly."  *Id.* at 12.  Sharks Sports also "failed to meet the standard for supplementing the record with this document."  *Id.*  "[A] party cannot circumvent the rules governing record supplementation by asking for judicial notice rather than supplementation."  *Native Ecosys. Council v. Weldon*, 848 F. Supp. 2d 1207, 1228 (D. Mont. 2012).

As for the City of San Jose 2019 General Plan Amendments, Long Range Impact Analysis, dated August 29, 2019, Sharks Sports seeks to use the document to show "that automobile drive alone use will remain constant in San Jose through 2040."  ECF No. 86-1 ¶ 4.  However, the document postdates the Final SEIS/SEIR and ROD in the instant case, and therefore could not have been considered by the FTA.  Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the Agency's decision."  *Center for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006) (internal quotation marks and citation omitted).

## IV.    DISCUSSION

The Bay Area Rapid Transportation ("BART") serves the San Francisco Bay Area counties of Alameda, Contra Costa, San Francisco, and San Mateo.  FTA 20735.  As of February 2018, when the Final SEIS/SEIR was drafted, BART consisted of an approximately 104-mile, 44-station regional rail system that extended from Millbrae, north to San Francisco International Airport, north to San Francisco, then over the San Francisco Bay to Oakland, and finally south to Fremont.  *Id.*

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1    As noted, the instant case concerns the VTA's Bay Area Rapid Transportation Silicon

2    Valley Program ("Extension Program").  The Extension Program consists of a 16-mile transit

3    extension from BART's Warm Springs Station in southern Fremont into Santa Clara County

4    through the cities of Milpitas, San Jose, and Santa Clara.  FTA 25.  The Extension Program is

5    divided into two phases: the Phase I Berryessa Extension Project ("Phase I Project") and the

6    BART Silicon Valley Phase II Extension Project ("Phase II Project").  *Id.*

7        The Phase I Project consists of an approximately 10-mile extension of the BART system

8    from Warm Springs Station in southern Fremont into the Berryessa neighborhood of San Jose, in

9    eastern Santa Clara County.  FTA 20736.  The Phase II Project would extend the BART system

10    from the Phase I terminus in the Berryessa neighborhood of San Jose for approximately 6 miles

11    through central San Jose and terminate in the City of Santa Clara.  FTA 20737.  The alignment

12    would include an approximately 5-mile tunnel, or subway, through downtown San Jose.  *Id.*

13    Completion of the Extension Program would "ring" the Bay Area, as BART would run from

14    Millbrae, through San Francisco, Oakland, Fremont, and San Jose, to Santa Clara.  FTA 20665.

15    Caltrain already provides service between downtown San Jose and downtown San Francisco

16    through Santa Clara, Millbrae, and San Francisco International Airport.  FTA 20734.

17        The Phase II Project would create four new BART stations as part of the extension: Alum

18    Rock/28th Street, Downtown San Jose, Diridon, and Santa Clara.  *Id.*  Diridon Station already

19    exists and is a "multi-modal transportation center within the City of San Jose's downtown urban

20    core."  FTA 20987.  Diridon Station is currently "served by several transit modes including VTA's

21    Light Rail and express and local bus service, ACE, Amtrak, Capitol Corridor, and regional bus

22    lines to Alameda and Santa Cruz County."  *Id.*  The Extension Program would make Diridon

23    Station a BART station as well.

24        The instant case primarily concerns the FTA's treatment of parking impacts at the new

25    BART station proposed to be constructed at Diridon Station as part of the Phase II Project of the

26    Extension Program.

27

28    Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

According to Sharks Sports, the FTA violated NEPA and the APA because: (1) the FTA improperly held that parking impacts are not environmental impacts under NEPA; and (2) the FTA's decision not to provide parking at Diridon Station was predetermined.  Sharks Sports further contends that the content of the Final SEIS/SEIR violated NEPA and the APA because: (3) the Final SEIS/SEIR failed to take a "hard look" at numerous types of parking impacts; (4) the Final SEIS/SEIR violated NEPA's "scientific integrity" requirement; (5) the Final SEIS/SEIR failed to disclose and analyze contradictory studies; (6) the Final SEIS/SEIR failed to apply NEPA analysis to the TOJD; (7) the FTA failed to supplement the Final SEIS/SEIR in response to new information; and (8) the Final SEIS/SEIR does not analyze a reasonable range of alternatives.

The Court begins by addressing an argument in Sharks Sports' opposition concerning the travel demand raw data that was produced in the instant case.  The Court then turns to Sharks Sports' arguments that the FTA failed to consider parking impacts to be environmental impacts under NEPA, and that the FTA predetermined the issue of parking at Diridon Station.  The Court then addresses each of Sharks Sports' arguments as to the sufficiency of the Final SEIS/SEIR in turn.

### A. Sharks Sports' Arguments About the Travel Demand Raw Data Fail.

As an initial matter, Sharks Sports complains about the manner in which the travel demand raw data was produced in the instant case.  According to Sharks Sports, "the Court's order required the full model be included in the AR," but the FTA "failed to produce the 'VTA' 2015 Travel Demand Model in a readable format."  Sharks Opp'n at 3.  Sharks Sports appears to refer to the travel demand raw data that underlies the specific outputs contained within the Final SEIS/SEIR.  *Id.* at 3 n.1 (explaining that Plaintiff cannot "review the data" that underlies outputs in Final SEIS/SEIR).  Sharks Sports claims that "what was produced was a flash drive of gobblygook [*sic*] with no way to extract the data."  *Id.* at 6.

As discussed in the foregoing, Sharks Sports mischaracterizes the situation.  United States Magistrate Judge van Keulen ordered the parties to "promptly meet and confer in good faith" as to

18

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1   whether the cited travel demand raw data "should be added to the administrative record."  ECF

2   No. 79 at 19.  Judge van Keulen explained that "[t]he Court expects the parties to reach agreement

3   on these issues; however, any remaining dispute must be presented to the undersigned in a joint

4   letter brief filed no later **than noon on February 7, 2020**."  *Id.* (emphasis in original).

5       On April 15, 2020, after both of the foregoing cross-motions for summary judgment had

6   already been filed and two days before Sharks Sports' final summary judgment brief was due, the

7   parties filed a joint case management statement.  ECF No. 90.  In that joint case management

8   statement, Sharks Sports stated for the first time that Sharks Sports lacked the ability to read the

9   travel demand raw data that the FTA had produced pursuant to Judge van Keulen's order because

10  Sharks Sports "believe[d] that the information is inaccessible without Hexagon's program

11  necessary to read the information."  *Id.* at 3.  Sharks Sports asserted that Sharks Sports had been

12  "unable to review the information and must either [*sic*] be able to do so as soon as possible so the

13  relevant information can be filed to complete the record."  *Id.*

14      The Court construed Sharks Sports' statement as a renewed motion to compel completion

15  or supplementation of the administrative record.  ECF No. 91 at 2.  The Court explained that

16  Sharks Sports' request was "extremely untimely."  *Id.*  The Court noted that "Judge van Keulen

17  clearly ordered the parties to present 'any remaining dispute' related to the data in question to the

18  Court by 'no later than **noon on February 7, 2020**.'  ECF No. 79 at 19 (emphasis in original)."

19  *Id.*  Notwithstanding this instruction, Sharks Sports "utterly failed" to raise the issue for two

20  months.  *Id.*  The Court noted that even when Sharks Sports did raise the issue, Sharks Sports only

21  did so "in the context of a mandatory joint case management statement, not in a formal motion."

22  *Id.*  Sharks Sports "provide[d] no justification for the lengthy delay."  *Id.*

23      The Court also explained that Sharks Sports' April 15, 2020 request would be "highly

24  prejudicial."  *Id.* at 3.  The Court noted that Sharks Sports "filed a motion for summary judgment

25  on February 21, 2020.  Defendants filed a cross-motion for summary judgment and opposition on

26  March 27, 2020.  Plaintiff's reply and opposition [were] due tomorrow, on April 17, 2020.  After

27

28  Case No. 18-CV-04060-LHK

    ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    that, the sole remaining filing on the cross-motions for summary judgment, Defendant's reply,

2    [was] due on May 1, 2020." *Id.* (citations omitted).  Accordingly, Sharks Sports' "request would

3    require fundamental modifications to the briefing schedule at the eleventh hour, when summary

4    judgment briefing [was] already almost entirely complete." *Id.*  The Court therefore denied Sharks

5    Sports' renewed motion and noted that "Judge van Keulen concurs in the Court's ruling on this

6    issue." *Id.*

7            Sharks Sports' continued attempt to invoke its inability to read the travel demand raw data

8    fails for at least five reasons.  First, according to Sharks Sports, the travel demand raw data must

9    be extracted "so it can be reviewed and relevant portions placed in the AR."  Sharks Opp'n at 6–7.

10   However, the FTA never considered the travel demand raw data.  ECF No. 90 at 6 ("FTA

11   considered the tables in the Final SEIS/SEIR (part of the AR), not the underlying raw data used to

12   create those tables."); *see also* Sharks Mot. at 6 (noting that using the raw data, "Hexagon []

13   provided specific outputs in response to specific agency questions").  To the extent that Sharks

14   Sports seeks to challenge the outputs of the travel demand raw data that are located in the Final

15   SEIS/SEIR, Sharks Sports had all of the information necessary to do so.  In fact, Sharks Sports did

16   challenge outputs of the travel demand raw data in the administrative process.  FTA 22696

17   (complaining that "the travel demand model used for the 2016 DEIS . . . predicts daily boardings

18   and alightings at the Diridon Station in 2035 would be only 13,771").

19           Second, to the extent that Sharks Sports seeks to use the data to produce different outputs

20   that the FTA never considered, this would entail review of information outside the administrative

21   record that postdates the creation of the Final SEIS/SEIR.  *See Center for Biological Diversity*,

22   450 F.3d at 943 (noting that the review of "post-decision information as a new rationalization

23   either for sustaining or attacking the Agency's decision" is generally improper).

24           Third, Sharks Sports' argument is untimely.  As noted, "Judge van Keulen clearly ordered

25   the parties to present 'any remaining dispute' related to the data in question to the Court by 'no

26   later than **noon on February 7, 2020**.'  ECF No. 79 at 19 (emphasis in original)." *Id.*

27

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

1   Notwithstanding this instruction, Sharks Sports utterly failed to raise the issue until April 15,

2   2020, more than two months after the deadline.  *Id.*  Moreover, those two months were critical to

3   the case.  Sharks Sports filed their motion for summary judgment on February 21, 2020, and the

4   FTA filed its cross-motion for summary judgment and opposition to Sharks Sports' motion for

5   summary judgment on March 27, 2020.  Sharks Sports provided no justification for the lengthy

6   delay, and Sharks Sports has still yet to do so.

7       Fourth, even when Sharks Sports did raise the issue, Sharks Sports only did so in a

8   statement in a mandatory joint case management statement, and not in a formal motion.  ECF No.

9   90.  In fact, Sharks Sports has never filed a motion on this issue.  Sharks Sports therefore never

10  properly raised the issue.

11      Fifth, although Sharks Sports seeks to make the issue a centerpiece of Sharks Sports'

12  opposition, Sharks Sports failed to raise the issue in its opening motion for summary judgment.

13  Sharks Sports therefore waived the argument.  *See, e.g.*, *Banga v. Experian Info. Sols., Inc.*, No. C

14  09-04867 SBA, 2013 WL 1209946, at *3 (N.D. Cal. Mar. 25, 2013) ("Because this argument was

15  not raised in Plaintiff's opening brief, the Court disregards it."); *see also Zango, Inc. v. Kaspersky*

16  *Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("[A]rguments not raised by a party in an

17  opening brief are waived.").

18      Sharks Sports' dilatory conduct entirely undercuts their argument about the importance of

19  the travel demand raw data.  For the reasons stated above, Sharks Sports' argument about the need

20  to read the travel demand raw data is not well-taken.[5]  The Court now considers Sharks Sports'

21  arguments that the FTA improperly held that parking impacts are not environmental impacts under

22

23  _____

24  [5] The Court also rejects Sharks Sports' argument that certain tables in the Final SEIS/SEIR are
    attributed to the VTA and not to Hexagon Transportation Consultants.  Sharks Opp'n at 3 n.1.  As

25  an initial matter, the argument is unclear because the specific table Sharks Sports cites is indeed
    attributed to "Hexagon Travel Consultants."  FTA 20953.  Moreover, Sharks Sports itself

26  conceded in its motion for summary judgment that "Hexagon [] provided specific outputs in
    response to specific agency questions," such as a Diridon Station parking structure's impact on

27  BART ridership.  Sharks Mot. at 6.  Thus, Sharks Sports conceded that Hexagon Transportation
    Consultants generated the tables.

28  Case No. 18-CV-04060-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT

NEPA.

**B.  The Final SEIS/SEIR Recognized that Parking Impacts May Be Environmental Impacts.**

As an initial matter, Sharks Sports argues that parking impacts are covered by NEPA, and that "the [FTA's] reversal of policy to treat parking as not an environmental impact in the SEIS/SEIR requires an explanation."  Sharks Mot. at 13–14 (emphasis omitted).  To the extent that Sharks Sports argues that the FTA categorically determined that parking impacts cannot constitute environmental impacts, Sharks Sports is mistaken.  In the Final SEIS/SEIR and throughout the Extension Program, the FTA recognized that "transit projects can affect the availability and location of parking spaces and can be a local concern."  FTA 22840.  Therefore, "[p]otential parking impacts include consequences of, or impacts from, new parking lots constructed to serve transit facilities, changes in parking demand as a result of transit facility construction/service expansion, and changes to on- and off-street parking during construction and operation of a project."  *Id.*

As further discussed *infra*, in *Japanese Village, LLC v. Fed. Transit Admin.*, 843 F.3d 445 (9th Cir. 2016), the Ninth Circuit noted that "[t]here are no NEPA thresholds for determining the significance of parking impacts, and [the plaintiff] has not cited any cases in which a court has found an EIS inadequate for failure to consider increased demand on an existing parking structure."  *Id.* at 462.  Notwithstanding this fact, the Final SEIS/SEIR in the instant case assumed that transit projects like the Phase II Project of the Extension Program may cause adverse parking impacts of the kind Sharks Sports articulates.

Hence, to the extent that Sharks Sports argues that the Final SEIS/SEIR categorically declined to consider parking impacts as possible adverse impacts under NEPA, that argument fails.  The Court now turns to Sharks Sports' argument that the FTA's decision not to include parking at Diridon Station was predetermined.

**C.  The FTA's Decision Not to Include Parking at Diridon Station Was Not Predetermined.**

22

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1       Sharks Sports argues that the FTA engaged in "pretext and bad faith" when the FTA

2  approved the Final SEIS/SEIR with no parking structure at Diridon Station.  Sharks Mot. at 15–

3  16.  The FTA, on the other hand, asserts that Sharks Sports' argument is based on a

4  misrepresentation of the administrative record.  FTA Mot. at 23–24.  The Court agrees with the

5  FTA.

6       As noted, Sharks Sports claims that the FTA's treatment of parking at Diridon Station

7  represents "pretext and bad faith," and Sharks Sports cites the United States Supreme Court's

8  recent decision in *Dept. of Commerce v. New York*, 139 S. Ct. 2551 (2019).  In that case, the

9  Supreme Court rejected the Department of Commerce's explanation for the reinstatement of a

10  citizenship question in the census questionnaire.  *Id.* at 2575.  Specifically, the Supreme Court

11  determined that the stated explanation for the inclusion of the citizenship question, a desire to

12  gather data to enforce the Voting Rights Act, was "incongruent with what the record reveals about

13  the agency's priorities and decisionmaking process."  *Id.*  Accordingly, the Supreme Court

14  remanded the case back to the Department of Commerce to provide another explanation.  *Id.*

15       The relevance of *Dept. of Commerce v. New York* to the instant case appears to be tenuous.

16  In the instant case, Sharks Sports does not point to any official explanation for the lack of parking

17  structure at Diridon Station that serves as a pretext for an unspoken explanation.  Instead, Sharks

18  Sports primarily asserts that "the decision to eliminate parking and to move station parking into

19  the project description was made in 2013."  Sharks Mot. at 16.  Thus, the thrust of Sharks Sports'

20  "pretext and bad faith" argument appears to be that the FTA predetermined the issue of parking at

21  Diridon Station.

22       The Ninth Circuit has held that "the comprehensive 'hard look' mandated by Congress and

23  required by the statute must be timely, and it must be taken objectively and in good faith, not as an

24  exercise in form over substance, and not as a subterfuge designed to rationalize a decision already

25  made."  *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).  An agency may therefore violate

26  NEPA and the APA when the agency "mak[es] an irreversible and irretrievable commitment of

27

28  Case No. 18-CV-04060-LHK

23

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

resources" before the preparation of an environmental impact statement. *Id.* at 1143. However, "unusual facts and circumstances" must be present for a court to find predetermination. *Metcalf*, 214 F.3d at 1145; *see also Crenshaw Subway Coal. v. Los Angeles Cty. Metro. Transportation Auth.*, No. CV 11-9603 FMO (JCX), 2015 WL 6150847, at *18 (C.D. Cal. Sept. 23, 2015) (explaining that "evidence of predetermination must meet a high standard").

Several decisions cited by Sharks Sports describe some "unusual facts and circumstances" in which courts have found predetermination in the past. For instance, the *Metcalf* court held that an agency improperly predetermined an issue when the agency entered into a binding contract with a Native American tribe before the agency prepared an environmental impact statement, which necessarily committed the agency to a particular outcome. *Metcalf*, 214 F.3d at 1145 ("Here, before preparing an EA, the Federal Defendants signed a contract which obligated them both to make a proposal to the IWC for a gray whale quota and to participate in the harvest of those whales."). Similarly, in *International Snowmobile Manufacturers Ass'n v. Norton*, 340 F. Supp. 2d 1249 (D. Wy. 2004), a high-ranking federal official made numerous "prejudicial" public comments before the conclusion of the agency's decision making process. *Id.* at 1260. The court found that these public comments, taken together, "indicate[d] a prejudged political conclusion." *Id.* at 1261.

Here, again, Sharks Sports' theory is that "the decision to eliminate parking and to move station parking into the project description was made in 2013." Sharks Mot. at 16. However, Sharks Sports fails to point to any "irreversible and irretrievable commitment of resources" that would align the instant case with the "unusual facts and circumstances" outlined above. *Metcalf*, 214 F.3d at 1145. Indeed, Sharks Sports only points to two documents in the administrative record. Neither document provides evidence of predetermination.

First, Sharks Sports cites a November 20, 2013 letter from the VTA (not the FTA) to other federal and state agencies, in which the VTA invited the other agencies to participate in the environmental review process for the Phase II Project of the Extension Program. That letter

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    indicated that the VTA and FTA had decided to "consider" a new version of the Phase II Project

2    with no parking "proposed" at Diridon Station.  FTA 37564–567 (describing "Current Project

3    under Consideration" and stating that "[n]o parking is proposed for either the East or West options

4    at Diridon Station").  Consideration of a proposal does not amount to an "irreversible or

5    irretrievable commitment of resources."  *Metcalf*, 214 F.3d at 1145 (explaining that an agency's

6    decision to "begin consideration of an action" or "lend support to [a] proposal" does not amount to

7    predetermination).

8        Second, Sharks Sports cites the Environmental Scoping Report for the Final SEIS/SEIR.

9    Similarly, however, the cited portion of the Environmental Scoping Report only states that the

10    scope of the Phase II Project had evolved such that there was no longer parking "proposed" at

11    Diridon Station.  FTA 8175 (noting that "[p]arking structures are proposed at the Alum Rock and

12    Santa Clara Stations" but not at other stations).  The Environmental Scoping Report merely

13    describes the scope of the proposed Phase II Project.  The decision to set the scope of a proposed

14    project, without more, does not amount to an "irreversible or irretrievable commitment of

15    resources."  *Metcalf*, 214 F.3d at 1145.

16        Hence, neither document constitutes evidence that the FTA irreversibly and irretrievably

17    committed to forgo the provision of parking at Diridon Station.  *Id.* at 1142.  Thus, Sharks Sports

18    has not shown that the FTA's decision not to provide a parking structure at Diridon Station was

19    predetermined.  The Court now addresses Sharks Sports' arguments about the content of the Final

20    SEIS/SEIR.

21       **D. The Final SEIS/SEIR Does Not Violate NEPA.**

22        Next, Sharks Sports makes a host of arguments that the content of the Final SEIS/SEIR

23    was defective, and thereby violated NEPA and the APA.  As noted, according to Sharks Sports:

24    (1) the Final SEIS/SEIR failed to take a "hard look" at numerous types of parking impacts; (2) the

25    Final SEIS/SEIR violated NEPA's "scientific integrity" requirement; (3) the Final SEIS/SEIR

26    failed to disclose and analyze contradictory studies; (4) the Final SEIS/SEIR failed to apply NEPA

27

28    Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1    analysis to the TOJD; (5) the FTA failed to supplement the Final SEIS/SEIR in light of new

2    information; (6) the Final SEIS/SEIR failed to consider a reasonable range of alternatives.  The

3    Court considers these arguments in turn.

4        **1.  The FTA Took a "Hard Look" at Parking Impacts.**

5        Sharks Sports argues that the FTA failed to take a "hard look" at various parking impacts

6    at Diridon Station.  Sharks Mot. at 15.  By contrast, the FTA asserts that the Final SEIS/SEIR

7    followed the steps required by Ninth Circuit precedent.  FTA Mot. at 15.  The Court agrees with

8    the FTA.

9        NEPA is a procedural statute that is designed to ensure that agencies "are fully aware of

10   the impact of their decisions on the environment."  *Oregon Envt'l Council v. Kunzman*, 817 F.2d

11   484, 492 (9th Cir. 1987).  Thus, an agency need only take a "hard look" at a decision and need not

12   ensure that environmental concerns trump all others.  *Robertson v. Methow Valley Citizens*

13   *Council*, 490 U.S. 332, 353 (1989) (holding that NEPA requires neither that actions be taken to

14   mitigate adverse effects of federal actions, nor that an environmental impact statement include an

15   explanation of what measures will be employed to mitigate adverse environmental impacts).  In

16   order to determine whether the FTA took a "hard look" at parking impacts under the Final

17   SEIS/SEIR, the Court must apply a "rule of reason" standard to "determine whether the [Final

18   SEIS/SEIR] contains a reasonably thorough discussion of the significant aspects of the probable

19   environmental consequences."  *League of Wilderness Defenders-Blue Mountains Biodiversity*

20   *Proj. v. United States Forest Serv.*, 689 F.3d 1060, 1076 (9th Cir. 2012) (citation omitted).  "This

21   standard 'requires a pragmatic judgment whether the EIS's form, content[,] and preparation foster

22   both informed decision-making and informed public participation.'"  *Id.* (quoting *Native*

23   *Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005)) (alteration in

24   original).

25       Sharks Sports contends that the Final SEIS/SEIR failed to take a "hard look" at numerous

26   types of parking impacts.  First, and at the greatest length, Sharks Sports contends that the "FTA

27

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

failed to take a 'hard look' at the parking spillover impacts caused by the Project."  Sharks Mot. at

2.  Second, Sharks Sports argues that the direct impact of the Phase II Project on 715 existing

parking spaces around Diridon Station "is completely unstudied, and has been entirely ignored."

*Id.* at 19.  Third, Sharks Sports argues that the Final SEIS/SEIR failed to examine "indirect

impacts" based on a potential lack of parking around Diridon Station.  *Id.* at 20.  Fourth, Sharks

Sports argues that the Final SEIS/SEIR failed to examine "Arena-specific impacts."  *Id.* at 23–24.

The Court considers these arguments in turn.

### a.  The FTA Took a Hard Look at Spillover Parking.

Sharks Sports contends that the "FTA failed to take a 'hard look' at the parking spillover

impacts caused by the Project" at Diridon Station.  Sharks Mot. at 2.  In other words, Sharks

Sports worries that because Diridon Station does not have BART-provided parking, BART riders

who access Diridon Station "will take parking from existing parking used by the Arena, Caltrain

and other businesses and residences in the Diridon area."  Sharks Mot. at 1.  Sharks Sports claims

that the SEIS/SEIR failed to take a hard look at this issue.  *Id.*

A recent Ninth Circuit decision provides clear guidance on this question.  Indeed, in

*Japanese Village, LLC v. Fed. Transit Admin.*, 843 F.3d 445 (9th Cir. 2016), the Ninth Circuit

considered a NEPA challenge to an agency's consideration of spillover parking.  In *Japanese

Village*, the plaintiff, a business called Japanese Village, argued that the environmental impact

statement that accompanied a light rail extension project ran afoul of NEPA because the

environmental impact statement "failed to adequately consider the increased demand that the new

Little Tokyo transit station will place on Japanese Village's existing parking structure."  *Id.* at 461.

The plaintiff worried that "[b]ecause the new transit station will not provide additional parking and

will be located only 16 feet from Japanese Village's parking structure, . . . the parking used by its

employees and customers will be overrun by rail commuters."  *Id.*  Indeed, Sharks Sports

concedes that the discussion of spillover impact in *Japanese Village* "is a succinct statement of the

Sharks' concerns" in the instant case.  Sharks Opp'n at 17.

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    The Ninth Circuit rejected the NEPA challenge.  The Ninth Circuit explained that "[t]here

2    are no NEPA thresholds for determining the significance of parking impacts," and that the Ninth

3    Circuit was unaware of any cases in which a court has "found an EIS inadequate for failure to

4    consider increased demand on an existing parking structure."  843 F.3d at 463.  According to the

5    Ninth Circuit, the FTA satisfied NEPA because the FTA "estimated the number of parking spaces

6    that could be lost in Little Tokyo due to the Project, but they also estimated the number of spaces

7    that they expect the area to gain from other development."  *Id.*  Further, the FTA "discussed how

8    increased use of public transit would at least partially offset the need for additional parking," and

9    also "discussed possible mitigation measures."  *Id.*  In light of the foregoing, the Ninth Circuit

10   concluded that the FTA "provided at least some analysis of the Project's parking impacts and

11   likely mitigating factors," and therefore held that "[t]he record indicates that [the FTA] took the

12   requisite 'hard look' at the parking impacts of the proposed Project before it was approved."  *Id.*

13   The FTA took very similar steps in the Final SEIS/SEIR.  First, the Final SEIS/SEIR

14   considered the loss of parking spaces caused by the construction of the BART Station at Diridon

15   Station, as well as the creation of new parking spaces at nearby BART stations.  FTA 20987

16   ("Construction of the Diridon Station would permanently remove approximately 715 existing off-

17   street publicly-available parking spaces that are across the street from and also support the SAP

18   Center."); FTA 20990 ("The Alum Rock/28th Street and Santa Clara Stations would provide up to

19   1,700 parking spaces.").  Specifically, the Final SEIS/SEIR noted that roughly 715 parking spaces

20   would be eliminated by Diridon Station, but the Final SEIS/SEIR stated that two new BART

21   stations, the Alum Rock and Santa Clara Stations, "would provide up to 1,700 parking spaces,"

22   which would more than offset the loss of parking spaces.  *Id.*  The Final SEIS/SEIR also

23   considered the 2017 Parking Inventory, which found that there are "approximately 14,450

24   publicly-available parking spaces located within 0.5 mile of Diridon Station."  FTA 2098–88,

25   36634–39.  The Final SEIS/SEIR concluded that the loss of 715 spaces "would impact 4.9

26   percent" of the 14,450 spaces.  FTA 20988.  The Final SEIS/SEIR concluded that in light of the

27

28   Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1  "large number of other public parking opportunities available in the area," the loss of these

2  approximately 715 spaces would not be an adverse impact.  *Id.*

3        Second, according to the Final SEIS/SEIR, "parking will be continually reviewed as part of

4  the San Jose Diridon Integrated Station Concept Plan."  FTA 20990.  The Final SEIS/SEIR stated

5  that "[t]his plan would address the provision and location of parking in the area, including parking

6  demand for BART and High-Speed Rail."  *Id.*  Moreover, in the meantime, the "VTA would

7  closely monitor parking activity at all stations and institute control measures where necessary."

8  *Id.*  According to the Final SEIS/SEIR, "[p]ossible measures include parking charges, parking

9  time, and location restrictions to prevent long-term parking in neighborhoods, and/or other actions.

10  VTA would also continue to work with the Cities of San Jose and Santa Clara and other transit

11  agencies to implement appropriate parking policies to manage non-BART-related parking demand

12  adjacent to these stations."  *Id.*

13        Third, the Final SEIS/SEIR opined that the increased availability of public transportation

14  would reduce parking demand in the Diridon Station area.  For instance, the Final SEIS/SEIR

15  explained that "[t]he convenience of having a BART station across the street would [] encourage a

16  transit access alternative for those attending SAP Center events and reduce the number of vehicles

17  traveling to SAP Center events."  FTA 20980.  For instance, the Final SEIS/SEIR examined other

18  public transportation stations near other California event centers, and offered a "conservative"

19  estimate of the number of SAP Center patrons who would likely use public transportation to

20  access the SAP Center and thereby reduce spillover parking.  FTA 22141.  The Final SEIS/SEIR

21  also noted that "Diridon Station is an existing multi-modal transportation center located within the

22  City of San Jose's downtown urban core."  FTA 20987.  Diridon Station is currently "served by

23  several transit modes including VTA's Light Rail and express and local bus service, ACE,

24  Amtrak, Capitol Corridor, and regional bus lines to Alameda and Santa Cruz County," and the

25  Final SEIS/SEIR projected that almost 91 percent of access to Diridon Station would be by

26  walk/bicycle, heavy and light rail transit, and bus.  FTA 20985, 20987.  "Diridon Station is

29

projected to function more as a destination station in the AM commute direction, as patrons travel to nearby activity centers, than as an origin station." FTA 22140. This projection also pointed toward lower parking demand since, "[a]s a destination station, the parking demand at Diridon Station would be less than at stations that primarily function as origins in the AM commute direction." *Id.*

Fourth, the Final SEIS/SEIR considered the existence of local policies that "discourage[d] drive-alone trips to BART stations" and thereby reduced parking demand. FTA 20985. For instance, on June 9, 2016, the BART Board of Directors adopted a new BART Station Access Policy. Pursuant to that policy, for instance, BART now expressly aims to "[r]educe the access mode share of the automobile by enhancing multi-modal access to and from BART stations in partnership with communities and access providers." FTA 53871. Moreover, the Final SEIS/SEIR concluded that under the BART Station Access Policy, Diridon Station would likely fall into the category of an "urban" station, which, based on BART's station typology, would also suggest less parking demand. FTA 20985; FTA 22735 (providing definition of "urban" BART station).

Fifth, and finally, the Final SEIS/SEIR cited ridership modeling and mode-of-access modeling concerning the projected use of Diridon Station. FTA 20846; FTA 20953. The ridership modeling indicated that providing a 500-unit parking structure at Diridon Station would only result in an increased overall ridership of 19 passengers across BART. FTA 20846. Thus, the ridership modeling indicated that "without parking at Diridon Station, auto-based BART trips would shift to Alum Rock/28th Street and Santa Clara Stations, which provide parking." *Id.* Further, the mode-of-access modeling concluded that "no more tha[n] 0.5 percent or 68 average weekday BART riders are projected to access the Diridon Station by automobile and then park-and-ride in 2035."[6] FTA 22855.

_____

[6] Sharks Sports repeatedly asserts that the mode-of-access model "stated the parking demand at Diridon was zero." Sharks Mot. at 6 (emphasis omitted). That assertion is belied by the administrative record. FTA 22855 (explaining that output from mode-of-access modeling "does

30

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1    In light of the foregoing, and in the Court's "pragmatic judgment," the Court concludes

2    that the Final SEIS/SEIR contains the requisite "hard look" at spillover parking around Diridon

3    Station.  As discussed, the Final SEIS/SEIR considered the Extension Program's impact on

4    existing parking, the availability of new parking, various factors that would reduce the demand for

5    parking, and modeling that projected the mode-of-access and ridership at Diridon Station.  The

6    Ninth Circuit held that agency actions like the foregoing dictated that the FTA took a "hard look"

7    at parking impacts under NEPA in *Japanese Village*, and that holding applies with full force here.

8    843 F.3d at 461–63.

9    Sharks Sports argues that the Final SEIS/SEIR's analysis of spillover parking is

10    nevertheless inadequate.  The thrust of Sharks Sports' argument is that there is only one possible

11    way to analyze spillover parking: analysis of "unconstrained" parking demand.  Sharks Mot. at 7

12    ("An unconstrained study is the only way to obtain accurate forecasts and determine what

13    mitigation is needed.").  Analysis of unconstrained parking demand would examine how many

14    BART riders would park at Diridon Station if there were an infinite supply of BART parking

15    spaces available.  Sharks Opp'n at 4.

16    However, the Court "must be 'at its most deferential' when reviewing scientific judgments

17    and technical analyses within the agency's expertise under NEPA."  *Native Ecosystems Council*,

18    697 F.3d at 1051 (quoting *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668

19    F.3d 1067, 1075 (9th Cir. 2011)).  The appropriate way to project spillover parking at Diridon

20    Station is such a technical analysis.  Here, for instance, the FTA's ridership model showed "that

21    without parking at Diridon Station, auto-based BART trips shifted to the Alum Rock/28th Street

22    and Santa Clara Stations, which provide parking."  FTA 20986.  Indeed, the ridership model

23    indicated that with or without a parking structure at Diridon Station, "the overall systemwide

24    ridership among the four stations [constructed in the Phase II Project of the Extension Program]

25    remained relatively the same."  *Id.*  A logical inference from this result is that BART riders who

26

27    not mean 0 percent").

28    Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1  would have parked at Diridon Station if parking were provided would be very willing to travel to

2  another BART station for parking in the absence of a Diridon Station parking structure.  This, in

3  turn, would minimize spillover parking around Diridon Station.[7]  That is precisely the conclusion

4  at which the Final SEIS/SEIR arrived based on the ridership model.  *Id.*

5  Moreover, the *Japanese Village* court held that the FTA had taken a hard look at spillover

6  parking even though there was apparently no unconstrained parking demand analysis performed in

7  that case.  843 F.3d at 462 (discussing the "most directly responsive" portion of environmental

8  impact statement and deeming it sufficient under NEPA, notwithstanding lack of unconstrained

9  analysis).  Sharks Sports makes other arguments that are foreclosed by *Japanese Village*.  For

10  instance, Sharks Sports contests the FTA's assumption that increased public transit would prevent

11  spillover parking, and argues that "[t]here is nothing in the AR examining how public transit

12  would offset the need for parking at Diridon."  Sharks Opp'n at 20.  The *Japanese Village* court

13  rejected the plaintiff's near-identical argument that the FTA in that case was merely

14  "'philosophiz[ing]' that improved transit service may reduce the need for parking."  843 F.3d at

15  462.  Similarly, Sharks Sports asserts that the Final SEIS/SEIR's discussion of possible mitigation

16  for spillover parking is inadequate.  However, the Final SEIS/SEIR explained that parking activity

17  would be monitored, and that control measures such as parking charges and time and location

18  restrictions, would be instituted.  FTA 20990.  Similarly, the *Japanese Village* court repeatedly

19  relied on the fact that "Metro plans to 'conduct an annual parking capacity study of the Little

20  Tokyo area during construction to determine if there is sufficient parking availability.'"  843 F.3d

21  at 462–63.

22  Sharks Sports argues that *Japanese Village* is distinguishable for several reasons.  First,

23  Sharks Sports points to the fact that in *Japanese Village*, the FTA conducted a "160-page

24

25  _____

26  [7] By contrast, if the ridership model had showed that overall ridership dropped significantly without a parking structure at Diridon Station, this would suggest that a large number of BART
27  riders would be unwilling to travel to other BART stations, which would in turn point to the potential for high spillover parking.

28  Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    transportation analysis study, which included extensive discussion about the impact on parking,"

2    as well as a "Station Planning Toolkit." *Id.* at 461; Sharks Sports Opp'n at 17.  However, the

3    Ninth Circuit did not base its holding on the existence of these materials, and it is not clear to what

4    extent they were relevant to the specific issue of spillover parking.  Instead, the Ninth Circuit

5    focused almost entirely on "a paragraph in Chapter 4 of the FEIS," which the Ninth Circuit held to

6    be "most directly responsive to Japanese Village's concern about off-street parking."  843 F.3d at

7    462.  In light of the Ninth Circuit's analysis, the Final SEIS/SEIR contains a sufficiently thorough

8    discussion of parking impacts at Diridon Station.  *See, e.g.*, FTA 20985–89 (discussing parking

9    impacts at Diridon Station); *see also Cal. Coastal Commission v. U.S. Dept. of the Navy*, 22 F.

10   Supp. 3d 1081, 1103 (S.D. Cal. 2014) ("The primary difficulty with the CCC's arguments is that

11   the Navy has considered and analyzed the impacts of traffic, parking, and visual resources.").

12   Second, Sharks Sports seeks to distinguish *Japanese Village* because of the contention that "the

13   scientific integrity standard is profoundly at issue" in the instant case.  The Court addresses Sharks

14   Sports' arguments about scientific integrity *infra* Section III.C.2.  However, the Court notes that if

15   Sharks Sports' contention that unconstrained parking demand comprises the sole accurate way of

16   measuring spillover parking were correct, the defendant in *Japanese Village* would have also

17   presumably violated NEPA's "scientific integrity" mandate.

18        Accordingly, and in sum, the Court concludes that the FTA took a hard look at spillover

19   parking under NEPA.  The Court now turns to direct parking impacts.

20                    **b.  The FTA Took a Hard Look at Direct Parking Impacts.**

21        Sharks Sports argues that the direct impact of the Phase II Project on 715 existing parking

22   spaces around Diridon Station "is completely unstudied, and has been entirely ignored."  Sharks

23   Mot. at 19.

24        Contrary to Sharks Sports' statement, the Final SEIS/SEIR clearly discussed direct impacts

25   on existing parking at Diridon Station.  Indeed, the Final SEIS/SEIR acknowledged that due to the

26   BART extension, "[c]onstruction of the Diridon Station would permanently remove approximately

27                                                                    33

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

1    715 existing off-street publicly-available parking spaces."  FTA 22140–42.

2         However, the Final SEIS/SEIR also cited a 2017 Parking Inventory by Kimley Horn (the

3    "2017 Parking Inventory"), which found that there are "approximately 14,450 publicly-available

4    parking spaces located within 0.5 mile of Diridon Station."  FTA 20988.  The approximately

5    14,450 parking spaces consist of 2,605 on-street parking spaces and 11,845 off-street spaces.  *Id.*

6    The parking inventory includes "several public parking facilities and several large, privately

7    owned parking facilities with public access."  FTA 20987.  Indeed, Caltrain provides parking "on

8    three surface lots" near the Diridon Station, including one parking lot owned by the VTA.  *Id.*  In

9    addition, "a large parking lot is immediately west of the SAP Center for patrons of this facility."

10   *Id.*

11        Given the overall parking inventory, the Final SEIS/SEIR concluded that the loss of 715

12   parking spaces "would impact 4.9 percent" of the approximately 14,450 parking spaces.  FTA

13   20988.  Moreover, the addition of roughly 1,700 new parking spaces at the nearby Alum Rock and

14   Santa Clara BART Stations would offset the direct loss in parking spaces.  FTA 20990.  The Final

15   SEIS/SEIR thus concluded that the loss of these approximately 715 parking spaces would not be

16   an adverse impact because the existing parking capacity in the area is sufficient to accommodate

17   non-BART parking.  FTA 20988.

18        Sharks Sports takes issue with two aspects of the foregoing.  First, Sharks Sports argues

19   that the 2017 Parking Inventory overstated the approximate supply of parking around Diridon

20   Station was therefore illegitimate and "unscientific."  Sharks Opp'n at 19.  The Court rejects this

21   argument *infra* Section III.C.2.  Second, and notwithstanding the foregoing, Sharks Sports

22   summarily asserts that "715 spaces are the size of a block of surface parking.  That loss is

23   obviously very significant."  *Id.*  Sharks Sports may disagree with the substantive conclusion of

24   the Final SEIS/SEIR.  However, under NEPA, the Court "considers whether 'the decision was

25   based on consideration of the relevant factors and whether there has been a clear error of

26   judgment.'"  *Westlands Water Dist.*, 376 F.3d at 865.  Sharks Sports makes no argument to

27                                                      34

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    explain why, in light of the inventory of approximate spaces and the addition of 1,700 nearby

2    parking spaces, the FTA made a clear error of judgment in concluding that the loss of 715 parking

3    spaces would not be an adverse impact under NEPA.

4         Accordingly, the Court concludes that the FTA took a sufficiently hard look at direct

5    parking impacts under NEPA.  The Court now turns to indirect parking impacts.

**c.   The FTA Took a Hard Look at Indirect and "Arena-Specific" Parking Impacts.**

7         Sharks Sports argues that the Final SEIS/SEIR "did not address that the lack of adequate

8    parking during construction and long-term will result in indirect impacts including: congestion,

9    traffic safety, vehicle emissions etc."  Sharks Mot. at 20.  Sharks Sports also claims that the Final

10   SEIS/SEIR failed to address "Arena-specific" parking impacts that would uniquely affect the SAP

11   Center.  *Id.* at 21–24.

12        As to the indirect impacts of lack of parking, based on the FTA's analysis of spillover

13   parking and direct parking impacts at Diridon Station, the Final SEIS/SEIR concluded that "no

14   indirect traffic or air quality impacts would be caused by cars circling and looking for parking at

15   [Diridon] station."  FTA 20989.  Similarly, the Final SEIS/SEIR analyzed the traffic-specific

16   impacts at "Event Centers," including the SAP Center.  FTA 20979–80.  Again, the Final

17   SEIS/SEIR explained that based on the FTA's analysis of spillover parking and direct parking

18   impacts at Diridon Station, "the number of vehicles on the adjacent roadways associated with the

19   BART Extension operations would not be substantial."  FTA 20981.  Moreover, the Final

20   SEIS/SEIR explained that "[t]he convenience of having a BART station across the street would []

21   encourage a transit access alternative for those attending SAP Center events and reduce the

22   number of vehicles traveling to SAP Center events."  FTA 20980.  Indeed, the Final SEIS/SEIR

23   examined other public transportation stations near other California event centers, and offered a

24   "conservative" estimate of the number of SAP Center patrons who would likely use public

25   transportation to access the SAP Center and thereby reduce spillover parking.  FTA 22141.  In

26   sum, the FTA concluded that "[t]here would be no adverse effects under NEPA."  FTA 20980.

27

28   Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1        Sharks Sports repeatedly asserts that the FTA's conclusions are incorrect, but Sharks

2   Sports provides no meaningful argument that the FTA's conclusions reflect a clear error in

3   judgment.  *Westlands Water Dist.*, 376 F.3d at 865.  Moreover, the Final SEIS/SEIR provides the

4   reasonably thorough discussion that NEPA requires.  *See City of Carmel-By-The-Sea v. U.S. Dep't*

5   *of Transp.*, 123 F.3d 1142, 1150 (9th Cir. 1997) ("We review an Environmental Impact Statement

6   under the 'rule of reason' to determine whether it contains 'a reasonably thorough discussion of

7   the significant aspects of the probable environmental consequences.'" (citation omitted)).

8        As for the indirect impact of "lack of adequate parking during construction," the Final

9   SEIS/SEIR concluded that short-term adverse parking impacts could arise from the construction

10  related to the Phase II Project of the Extension Program.  FTA 22133.  Accordingly, the Final

11  SEIS/SEIR adopted three mitigation measures in connection with those short-term adverse

12  impacts.  FTA 21454–58, 21481.  With the adoption of the three mitigation measures, the Final

13  SEIS/SEIR concluded that "construction of the Diridon Station South and North Options . . .

14  would result in no adverse effect on parking."  FTA 21482.

15       Sharks Sports critiques the second mitigation measure, "TRA-CNST-B," pursuant to

16  which the Final SEIS/SEIR commits to the adoption of "Construction Management Transportation

17  Plans" and "Traffic Control Plans" to coordinate construction-related issues associated with the

18  Phase II Project of the Extension Program.  Sharks Sports contends that "[t]he SEIS/SEIR does

19  not identify any specific details about this future [Construction Management Transportation Plan]

20  or even suggest metrics of its effectiveness."  Sharks Mot. at 20.

21       On the contrary, the Final SEIS/SEIR outlines five "critical components" that the

22  Construction Management Transportation Plans will contain, and also discusses how the

23  Construction Management Transportation Plans will be organized and implemented.  FTA 21456–

24  57.  The Final SEIS/SEIR also assesses the effectiveness of the mitigation measure.  For instance,

25  the Final SEIS/SEIR states that the mitigation measure will "reduce vehicular traffic impacts"

26  caused by construction near Diridon Station.  FTA 21474.  The mitigation measure would also

27

28  Case No. 18-CV-04060-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

"provide safe travel corridors for pedestrians and bicyclists within and through construction areas or provide detour routes with wayfinding signage." *Id.* The Final SEIS/SEIR ultimately estimates that the impact of the TRA-CNST-B, alongside the other two mitigation measures adopted for construction at Diridon Station, will be sufficient to reduce the impact of construction to non-adverse levels. This discussion is sufficiently detailed for the purposes of NEPA. *See, e.g.*, *S. Fork Band Council of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009) (noting that mitigation measure must be discussed with "sufficient detail to ensure that environmental consequences have been fairly evaluated" and must include "an assessment of whether the proposed mitigation measures can be effective").

Accordingly, the Court concludes the FTA took a hard look at indirect and "Arena-specific" parking impacts. In sum, based on the application of the "rule of reason" standard, the Court concludes that the Final SEIS/SEIR "contains a reasonably thorough discussion of the significant aspects" of the parking impacts cited by Sharks Sports required to satisfy NEPA's hard look requirement. *League of Wilderness*, 689 F.3d at 1076 (citation omitted). The Court now turns to Sharks Sports' argument that the Final SEIS/SEIR violates NEPA's "scientific integrity" requirement.

### 2. The Final SEIS/SEIR Did Not Violate NEPA's "Scientific Integrity" Requirement.

Sharks Sports repeatedly argues that the Final SEIS/SEIR violated NEPA's "scientific integrity" requirement. First, Sharks Sports complains that the Final SEIS/SEIR lacks "scientifically accurate" parking demand modeling. Sharks Mot. at 14–15. Second, Sharks Sports argues that the Final SEIS/SEIR improperly relied on an "unscientific parking 'inventory.'" *Id.* at 11.

NEPA regulations require that an agency ensure the "scientific integrity" of the discussions and analyses contained in an environmental impact statement, and also that the agency explicitly refer to "the scientific and other sources relied upon for conclusions in the [EIS]." 40 C.F.R. § 1502.24. The Court must be "most deferential when the agency is making predictions[] within its

37

1   area of special expertise." *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008)

2   (internal quotation marks omitted).  "At the same time, courts must independently review the

3   record in order to satisfy themselves that the agency has made a reasoned decision based on its

4   evaluation of the evidence." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1160 (9th Cir.

5   2006) (internal quotation marks omitted), *overruled on other grounds by Winter*, 555 U.S. 7

6   (2008).  The Court first applies the foregoing standard to the FTA's mode-of-access modeling.

7   The Court then applies the standard to the 2017 Parking Inventory cited by the Final SEIS/SEIR.

   **a.   The Final SEIS/SEIR Mode-of-Access Modeling Did Not Violate the Scientific Integrity Standard.**

8

9   As noted, the Final SEIS/SEIR performed several forms of modeling in the course of the

10  discussion of parking impacts at Diridon Station.  One such form of modeling comprised mode-of-

11  access modeling, which projected the proportion of BART riders who would access Diridon

12  Station through various forms of transportation, such as walking, biking, and driving.  FTA 20953.

13  Sharks Sports argues that the mode-of-access modeling violated NEPA's scientific

14  integrity requirement because the modeling included unwarranted assumptions about rider

15  behavior.  Of relevance to the instant case, the Final SEIS/SEIR stated that "no more tha[n] 0.5

16  percent or 68 average weekday BART riders are projected to access the Diridon Station by

17  automobile and then park-and-ride in 2035."  FTA 22855.  This projection in turn depended on the

18  assumption that BART riders would generally not access Diridon Station through park-and-ride in

19  the absence of "BART-specific auto park-and-ride facilities."  FTA 20985.  This form of analysis

20  is called a "constrained" model.  FTA 22856.

21  The use of a constrained mode-of-access model does not violate NEPA's scientific

22  integrity requirement.  *See Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87,

23  98 (1983) (explaining that agencies may rely "on assumptions which involve substantial

24  uncertainties" under NEPA).  As an initial matter, all predictive models must make simplifying

25  assumptions for the purposes of prediction.  This is just as true for the methodology favored by

26  Sharks Sports as it is for the methodology deployed in the Final SEIS/SEIR.  FTA 2321 (noting

27

   38

28  Case No. 18-CV-04060-LHK
   ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
   MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    that "travel forecasts should rightly be viewed as order of magnitude estimates, or ranges" and that

2    "individuals' actual future travel behavior could differ somewhat from predicted behavior").

3          As noted, Sharks Sports repeatedly argues that "[a]n unconstrained study is the only way to

4    obtain accurate forecasts and determine what mitigation is needed."  Sharks Mot. at 7.  As the

5    FTA recognized, however, an unconstrained study would apply the inaccurate assumption that

6    there were infinite parking spaces available for BART riders who wished to park-and-ride at

7    Diridon Station, such that anyone who wished to park at Diridon Station could automatically do

8    so.  FTA Opp'n at 7.  However, supply and demand for BART-provided parking are interrelated.

9    An assumption of the kind favored by Sharks Sports would therefore likely overstate the number

10   of BART riders who would park-and-ride at Diridon Station and also run counter to BART policy.

11   FTA 20982 ("When the parking demand equals or exceeds capacity, commuters are encouraged to

12   use other modes to get to BART stations.").

13         Here, the FTA explained at length why it believed that a constrained model provided a

14   more appropriate projection of rider behavior.  The Final SEIS/SEIR focused on the changing

15   character of the area surrounding Diridon Station.  First, the Final SEIS/SEIR noted that "BART

16   has implemented new policies to discourage drive-alone trips to BART stations."  FTA 22139.

17   Indeed, the Final SEIS/SEIR cited changes to the BART Station Access Policy.  *Id.*  Pursuant to

18   that policy, for instance, BART now expressly aims to "[r]educe the access mode share of the

19   automobile by enhancing multi-modal access to and from BART stations in partnership with

20   communities and access providers."  FTA 53871.  The BART Station Access Policy also includes

21   a typology of BART stations.  FTA 22139.  One category of BART stations within this typology is

22   "urban stations," for which BART will neither encourage nor invest in parking.  FTA 53874.  The

23   Final SEIS/SEIR opined that the Diridon Station would likely qualify as an urban station under

24   BART's typology, and indeed that "[t]he Diridon Station design would be similar to other BART

25   system Downtown stations where parking is not provided."  FTA 20980.

26         Second, the Final SEIS/SEIR cited the "Envision San Jose 2040 General Plan, Commercial

27

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

Downtown Land Use Plan Policies, and Transportation Policies," which the city of San Jose adopted in 2011.  FTA 20986.   Those policies dictate that all land development "'support pedestrian and bicycle circulation, and increase transit ridership.'"  Further, the policies "'speak to the urban, pedestrian-oriented nature of this area.  As such, uses that serve the automobile should be carefully controlled in accordance with the Downtown Land Use Policies.'"  *Id.*  Pursuant to the policies, San Jose also "aim[s] to establish circulation policies that increase bicycle, pedestrian, and transit travel, while reducing motor vehicle trips, to increase the City's share of travel by alternative transportation modes." *Id.*  In line with the foregoing, the Final SEIS/SEIR cited San Jose land use policy LU-3.5, which requires developers to "[b]alance the need for parking to support a thriving Downtown with the need to minimize the impacts of parking upon a vibrant pedestrian and transit oriented urban environment." *Id.*

Third, the Final SEIS/SEIR noted that "Diridon Station is projected to function more as a destination station in the AM commute direction, as patrons travel to nearby activity centers, than as an origin station." FTA 22140.  This projection indicated that "[a]s a destination station, the parking demand at Diridon Station would be less than at stations that primarily function as origins in the AM commute direction." *Id.*

Fourth, the Final SEIS/SEIR noted that "Diridon Station is an existing multi-modal transportation center located within the City of San Jose's downtown urban core."  FTA 20987.  Diridon Station is currently "served by several transit modes including VTA's Light Rail and express and local bus service, ACE, Amtrak, Capitol Corridor, and regional bus lines to Alameda and Santa Cruz County," and the Final SEIS/SEIR projected that access to Diridon Station would be "almost entirely (91 percent) by walk/bicycle, heavy and light rail transit, and bus."  FTA 20985, 20987.  Thus, Diridon Station "is well-served by many multimodal options for SAP customers and transit riders to access the station," which would logically result in a lower number of BART riders that would drive to Diridon Station in the absence of a BART-provided parking structure. *Id.*

40

1    These background conditions, which the Final SEIS/SEIR explicitly invoked, logically

2  reduce the likelihood that BART riders will park-and-ride at Diridon Station in the absence of

3  BART-provided parking.  Thus, these background conditions supported the FTA's decision to

4  utilize constrained mode-of-access modeling and thereby conclude that with no BART-specific

5  parking facility at Diridon Station, "no more tha[n] 0.5 percent or 68 average weekday BART

6  riders are projected to access the Diridon Station by automobile and then park-and-ride in 2035."

7  FTA 22855.

8    As noted, Sharks Sports contests the conclusions drawn from the foregoing analysis.  For

9  instance, Sharks Sports contends that the Final SEIS/SEIR's use of the BART Station Access

10  typology is incorrect, and that the Diridon Station would instead be more accurately characterized

11  as a "balanced intermodal station."  Sharks Mot. at 15.  However, the Court's role under NEPA is

12  not to resolve conflicting interpretations of the evidence.  The Court's role is merely to

13  "independently review the record in order to satisfy [itself] that the agency has made a reasoned

14  decision based on its evaluation of the evidence."  *Earth Island Inst.*, 442 F.3d at 1160; *see also*

15  *Marsh*, 490 U.S. at 385 (noting that "the Corps conducted a reasoned evaluation of the relevant

16  information and reached a decision that, although perhaps disputable, was not 'arbitrary or

17  capricious'").  The FTA provided a reasoned decision based on its analysis of the most likely

18  future conditions at Diridon Station.  Although Sharks Sports may disagree with the FTA's

19  conclusions, Sharks Sports fails to establish a NEPA violation.

20    Moreover, Sharks Sports argues that "hopes and dreams" about the area around Diridon

21  Station should play no role in the analysis.  Sharks Opp'n at 3.  However, since the Final

22  SEIS/SEIR aimed to project the number of BART riders who will park-and-ride at Diridon Station

23  in 2035, it is entirely reasonable for the Final SEIS/SEIR to consider forward-looking policies

24  explicitly designed to shape the nature of the area.  *See, e.g.*, FTA 54228, 54323–24 (noting "the

25  need to minimize the impacts of parking upon a vibrant pedestrian and transit oriented urban

26  environment" and intent to "[p]romote shared parking arrangements between private uses and the

27

28  Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

41

1    provision of commonly accessible commercial or public parking facilities which can serve

2    multiple users in lieu of providing individual off-street parking on a property-by-property basis").

3         Sharks Sports cites a sentence from a June 23, 2003 Travel Demand Forecast report

4    prepared in connection with the 2004 Draft EIS/EIR, in which Hexagon Transportation

5    Consultants, a transportation consultant for the VTA, stated that "projections of park and ride

6    demand can be either constrained based on the known number of parking spaces at each station or

7    unconstrained in order to study a more realistic projection of the demand for parking at each

8    station."  FTA 45929.  However, even assuming this statement is true, the FTA correctly points

9    out that "NEPA does not contain a best science requirement."  *E.g.*, *Native Ecosys. Council v.*

10   *Erickson*, 330 F. Supp. 3d 1218, 1239 (D. Mont. 2018).  More importantly, however, the cited

11   statement was made in 2003, and therefore could not have taken into account the background

12   conditions and policies on which the SEIS/SEIR relied to conclude that constrained mode-of-

13   access modeling reflected the appropriate mode of analysis.  Further, in *Japanese Village*, the

14   Ninth Circuit noted that "[t]here are no NEPA thresholds for determining the significance of

15   parking impacts, and [the plaintiff] has not cited any cases in which a court has found an EIS

16   inadequate for failure to consider increased demand on an existing parking structure."  843 F.3d at

17   462.  Yet if Sharks Sports' scientific integrity argument were correct, every environmental impact

18   statement that implicated parking demand would run afoul of NEPA in the absence of an

19   unconstrained study.  This does not align with the Ninth Circuit's analysis.  *Id.* at 463 (explaining

20   that the FTA satisfied NEPA when the FTA estimated the number of parking spaces to be lost,

21   estimated the number of parking spaces to be gained from other projects, discussed use of public

22   transportation of offset demand, and discussed possible mitigation measures).

23        Accordingly, the Court concludes that the mode-of-access modeling in the SEIS/SEIR did

24   not violate NEPA's "scientific integrity" standard.  The Court now proceeds to consider the 2017

25   Parking Inventory.

26        **b.  The 2017 Parking Inventory Did Not Violate the Scientific Integrity**
              **Standard.**

27

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1

2

3

4

5

As discussed above, the Final SEIS/SEIR included cited a 2017 Parking Inventory that was designed to approximate "the number of available parking spaces in the vicinity of Diridon Station." FTA 20987–88. The purpose of the inventory was to assess the impact of the permanent loss of the approximately 715 parking spaces at Diridon Station caused by the Phase II Project of the Extension Program. *Id.*

6

7

8

9

10

11

12

Sharks Sports contends that that the 2017 Parking Inventory was not "scientifically valid." Sharks Mot. at 11. The Court disagrees. The thrust of Sharks Sports' argument is that the 2017 Parking Inventory cited by the Final SEIS/SEIR "counted every space around Diridon Station regardless of whether or not it was available." *Id.* at 10 (emphasis omitted). Sharks Sports contends that this fact rendered the parking inventory illegitimate. *Id.* Sharks Sports argues that the Final SEIS/SEIR should have instead relied on a 2008 survey conducted by Hexagon Transportation Consultants. *Id.*

13

14

15

16

17

18

19

20

21

22

23

24

As to Sharks Sports' first point, the 2017 Parking Inventory sought to estimate the "total existing parking supply surrounding the proposed Diridon BART station." FTA 36634. The 2017 Parking Inventory therefore forthrightly acknowledged that "[d]istinctions were not made between private and [public] lots, or reserved and publicly available parking spaces" for most of the parking spaces inventoried. FTA 36635. Moreover, both the 2017 Parking Inventory itself and the Final SEIS/SEIR recognized that the inventory was only meant to provide an approximation of available spaces around Diridon Station. *Id.*; FTA 22133. The approach deployed by the 2017 Parking Inventory was a rational one. Shark Sports' belief that a different methodology should have been used to approximate parking availability around Diridon Station does not support a NEPA violation. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012) ("The mere fact that Native Ecosystems Council disagrees with the methodology does not constitute a NEPA violation.").

25

26

Indeed, the 2008 Hexagon Transportation Consultants parking survey that Sharks Sports argues should have been used was roughly ten years old by the time the 2017 Parking Inventory

27

28

43

United States District Court
Northern District of California

was conducted.  The purpose of the 2008 survey was only to "identify underutilized parking facilities in the Diridon Station area that could be leased by the Santa Clara Valley Transportation Authority," not to estimate the total amount of available parking around Diridon Station.  FTA 51103.  Thus, the 2008 survey focused on "nine publicly-owned parking facilities," based on a list "obtained from the City of San Jose."  *Id.*; *see* FTA 36634 (noting that 2017 inventory "study area includes all public streets and public and private surface lots and parking garages").[8]  In line with the 2008 survey, Sharks Sports argues that a "properly performed scientific study evaluated parking **availability** for future BART riders in the Diridon Station area."  Sharks Mot. at 10.  It is entirely unclear why the SEIS/SEIR should limit the inventory's focus to parking spaces' potential availability to BART riders, however.  The purpose of the 2017 Parking Inventory was to assess the impact of removal of 715 parking spaces on the area generally.  Sharks Sports fails to show that the FTA's decision to use the 2017 Parking Inventory instead of the 2008 survey conducted for a different purpose violated NEPA's scientific integrity requirement.

Accordingly, the Court concludes that the 2017 Parking Inventory cited by the Final SEIS/SEIR did not violate NEPA's "scientific integrity" standard.  The Court now turns to the Final SEIS/SEIR's treatment of prior analyses.

### 3.  The Final SEIS/SEIR Adequately Considered Prior Analysis.

Sharks Sports argues that the FTA's decision not to provide a parking structure at Diridon Station lacked a reasoned explanation in light of the "change in policy" it embodied, and also that the FTA failed to adequately engage with prior parking studies.  Sharks Mot. at 18–19; Sharks Opp'n at 14–16.  The Court disagrees.

As to the first argument, "[a]gencies enjoy 'considerable discretion' in defining the purpose and need of a project."  *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014).  The Final SEIS/SEIR explains that "purpose of the BART Extension" includes

---

[8] For this reason, the inventory and survey are not "contradictory," as Sharks Sports claims. Sharks Opp'n at 16.

Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    the improvement of public transit, the support of "local and regional land use plans," and

2    facilitating the "efforts of the Cities of San Jose and Santa Clara."  FTA 20738.  In turn, the City

3    of San Jose has promoted Downtown Urban Design Policies, which "speak to the urban,

4    pedestrian-oriented nature of this area."  FTA 20986.  Moreover, San Jose disfavors "uses that

5    serve the automobile," as they should be "carefully controlled" per the Downtown Land Use

6    Policies.  *Id.*  Likewise, BART has sought to prioritize cost-effective investments and

7    "generat[ing] the most riders with the least space."  FTA 53871.  To the extent that an explanation

8    is required for changing the Extension Project's proposal as to the presence of parking at Diridon

9    Station, the Final SEIS/SEIR provided one.

10        As to the second argument, according to Sharks Sports, "FTA ignored all the prior parking

11    studies and travel demand models showing that parking was an adverse environmental impact that

12    must be mitigated."  Sharks Mot. at 19.  Sharks Sports points to three previous environmental

13    documents prepared in connection with the Extension Program:  the 2004 Final EIR, the 2007

14    Final SEIR, and the 2010 Final EIS.  FTA 1709 (2004 Final EIR); FTA 3699 (2007 Final SEIR);

15    FTA 4713 (2010 Final EIS).  The 2004 Final EIR examined a version of Diridon Station that

16    would include 2,262 parking spaces, and calculated projected park-and-ride demand at Diridon

17    Station as 2,056 spaces as of 2025.  FTA 1857.  The 2007 Final EIS repeated that same projection

18    for the year 2030.  FTA 4116.  Finally, the 2010 Final EIS examined a version of Diridon Station

19    that would include 1,300 parking spaces, and calculated projected park-and-ride demand at

20    Diridon Station as 2,585 as of 2030.  FTA 4996.  The 2010 Final EIS therefore noted that

21    "[u]nconstrained parking demand for the Diridon/Arena Station . . . could exceed the capacity" of

22    the 1,300 parking-space structure proposed as part of the station.  FTA 4997.  The 2010 Final EIS

23    noted that "[c]onstruction of additional single purpose user parking facilities would not be

24    consistent with the City of San Jose's Master Plan for the Diridon area, which includes high-

25    density residential and commercial development."  *Id.*  Accordingly, the 2010 Final EIS

26    contemplated implementation of parking management strategies and leasing nearby parking

27

28    Case No. 18-CV-04060-LHK
      ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
      MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   facilities to mitigate the potential impact.  FTA 4998.

2          As an initial matter, the Final SEIS/SEIR references the previous analyses contained within

3   these earlier documents.  In fact, as Sharks Sports concedes, "all the prior Environmental Reviews

4   are incorporated into the SEIS/SEIR."  Sharks Opp'n at 1.  Further, the Final SEIS/SEIR

5   specifically listed "[p]arking impacts at Diridon Station" as an "area of controversy."  FTA 20677.

6   Moreover, in some ways, the previous environmental documents anticipate the decision that the

7   FTA ultimately made not to construct a parking structure at Diridon Station.  For instance, the

8   2004 EIS/EIR explained that "autos used to access park-and-ride spaces are a flexible mode of

9   transportation.  Individuals can often park at one BART station as conveniently as another—and

10  often do."  FTA 2321.  This proposition supports the Final SEIS/SEIR's conclusion that Alum

11  Rock and Santa Clara Stations can provide parking for Diridon Station.  Indeed, earlier documents

12  specifically contemplated shifting the construction of parking spaces between BART stations in

13  order to jointly accommodate park-and-ride demand at other stations.  FTA 1856 (noting that

14  "1,000 spaces shifted from the Alum Rock Station to Berryessa Station to address community

15  concerns about site impacts at the Alum Rock Station").  Further, of course, the 2007 Final EIR

16  expressly disclosed the No Parking Option at Diridon Station and explained that under such an

17  option, parking would be available at the Santa Clara Station.  FTA 3157 ("Under this option, no

18  parking structure would be constructed and no surface parking would be provided.  However,

19  additional parking would be provided at the Santa Clara Station.").

20         Sharks Sports nevertheless contends that the Final SEIS/SEIR "fail[ed] to provide a

21  reasoned explanation" for departure from the conclusions of the previous documents.  *Id.* at 15.

22  Sharks Sports cites several cases in support of this argument, but they are inapposite.  For

23  instance, Sharks Sports cites *Center for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir.

24  2018).  However, *Zinke* involved the Endangered Species Act and therefore involved the question

25  of whether the agency used the "best scientific and commercial data available," as required by 16

26  U.S.C. § 1533(b)(1)(A).  *Id.* at 1068.  Moreover, in *Zinke*, the agency omitted any reference to

27

28  Case No. 18-CV-04060-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   data from a study that contradicted the agency's conclusion. *Id.*; *see also Sierra Club v. Eubanks*,

2   (E.D. Cal. 2004) (explaining that environmental impact that "failed to disclose that [cited studies]

3   contained conclusions potentially contrary to the efficacy of the Project" likely violated NEPA);

4   *Sierra Club v. Bosworth*, 199 F. Supp. 2d 971, 981 (N.D. Cal. 2002) (holding that environmental

5   impact statement violated NEPA "by failing to disclose scientific opinion that opposes post-fire

6   logging").

7        In the instant case, as noted, the previous analyses and parking demand figures cited by

8   Sharks Sports are incorporated into the Final SEIS/SEIR.  Moreover, the FTA openly explained

9   why the Final SEIS/SEIR departed from the previous analyses.  *See* FTA 22138–40 (listing

10  reasons for changed assumptions about park-and-ride demand).  Specifically, the Final SEIS/SEIR

11  concluded that the previous analysis had not taken into account the urbanization of the area around

12  Diridon Station, along with related BART and San Jose policies.  FTA 20985; *see also* FTA

13  22837–38 (explaining that updated analysis used new "land use assumptions and demographic

14  inputs" relative to previous analyses).  The Final SEIS/SEIR also indicated that BART riders

15  could use the parking provided at Alum Rock or Santa Clara Stations.  FTA 20986.  Separately,

16  the Final SEIS/SEIR explained that the slight increase in total ridership did not warrant the cost of

17  construction of a parking structure at Diridon Station.  FTA 20985.

18       In sum, the Court concludes that the Final SEIS/SEIR adequately disclosed and addressed

19  the prior analysis of parking demand that Sharks Sports cites.  The Court now turns to Sharks

20  Sports' argument about transit-oriented joint development.

21      **4.  Transit-Oriented Joint Development is Not Sufficiently Intertwined with the Project to Require Analysis Under NEPA.**

22       Sharks Sports contends that the transit-oriented joint development ("TOJD") that is part of

23  the Phase II Project of the Extension Program is "sufficiently intertwined" with the federally

24  funded project to require analysis under NEPA.  Sharks Mot. at 22.  The FTA responds that the

25  TOJD is not funded by federal dollars and is not sufficiently intertwined with the rest of the Phase

26  II Project of the Extension Program.  FTA Mot. at 20.  The Court agrees with the FTA.

27                           47

28  Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

As an initial matter, Sharks Sports contends that the ROD in the instant case contradicts itself by stating that the TOJD is not included in the NEPA analysis but also that the TOJD is included in the "NEPA cumulative impact analysis."  Sharks Mot. at 22.  The ROD does not contradict itself.  Indeed, the FTA treated the TOJD as outside the scope of the federal project in the ROD.  Although the ROD notes that the TOJD is analyzed under the "NEPA cumulative impact analysis" in section 7.1.4 of the SEIS/SEIR, the same sentence makes clear that the TOJD is not part of the NEPA project.  FTA 273 ("While not a component of the NEPA BART alternative, . . . .").  The Final SEIS/SEIR contains cumulative impact analysis of both the BART extension alone and the BART extension with TOJD under NEPA and CEQA.  FTA 21916–48.  The mere fact that the Final SEIS/SEIR performed some analysis of the TOJD under a NEPA standard does not mean that the FTA considered the TOJD to be part of the federal project or that the TOJD is automatically intertwined with the federal project.

The TOJD is not sufficiently intertwined with the federal project to require NEPA analysis. NEPA requires a federal agency to prepare an environmental impact statement for "all major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  "Major federal actions" have been defined to include, among other things, "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies."  40 C.F.R. § 1508.18(a).  To determine whether a non-federal project is "sufficiently intertwined" with a federal project to constitute a federal action that requires review under NEPA "will generally require a careful analysis of all facts and circumstances surrounding the relationship."  *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1092 (9th Cir. 2003) (internal quotation marks and citation omitted).  Although "[t]here are no clear standards for defining the point at which federal participation transforms a state or local project into major federal action[,] . . . '[m]arginal' federal action will not render otherwise local action federal."  *Rattlesnake Coal. v. U.S. Envtl. Prot. Agency*, 509 F.3d 1095, 1101 (9th Cir. 2007) (quoting *Almond Hill Sch. v. U.S. Dep't of Agric.*, 768 F.2d 1030, 1039 (9th Cir. 1985)).  Further, the agency's "determination of the

48

United States District Court
Northern District of California

1    appropriate scope of the environmental review process is entitled to deference."  *Wetlands Action*

2    *Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1115 (9th Cir. 2000).

3        Here, the TOJD was a proposed independent action by VTA alone and was placed outside

4    the scope of the federal SEIS.  FTA 272–73, 20631–32.  The TOJD has "independent utility" and

5    may be constructed simultaneously with or after the Extension Program "dependent on the

6    availability of funding and subject to market forces."  FTA 20632.  The TOJD is included in the

7    Final SEIS/SEIR and other documents for analysis under the CEQA only.  *See, e.g.*, FTA 20990–

8    21025 (analyzing traffic impact of the BART extension with TOJD under CEQA only).

9        Sharks Sports makes only conclusory statements that the development of Diridon Station

10   was "sufficiently intertwined" with the TOJD, which is insufficient to overcome the deference due

11   to the agency's determination that the TOJD is outside the scope of the environmental review.

12   *Wetlands Action Network*, 222 F.3d at 1115.  By way of example, in *Laub*, the plaintiffs pointed to

13   language in a framework agreement, specific coordination requirements, cost-sharing

14   arrangements, and to make a sufficient showing to require a fact-intensive analysis of the

15   relationship between the federal and state involvement.  342 F.3d at 1092.

16       Here, in a single unadorned sentence, Sharks Sports states that "there are coordination

17   requirements, cost divisions between TOJD and the BART Project and a single plan for both

18   projects," with no citations to the record.  Sharks Opp'n at 25.  Sharks Sports has failed to make a

19   "sufficient showing" to overcome the deference owed to the FTA's determination that the TOJD is

20   not a federal project.  342 F.3d at 1092.  The Court now turns to Sharks Sports' argument that the

21   FTA should have performed supplemental analysis.

22       **5.  NEPA Does Not Require Supplemental Analysis.**

23       Sharks Sports argues that the FTA violated NEPA by not releasing "additional significant

24   new information, including deciding [*sic*] to use tunneling methodology" and also by failing to

25   supplement the Final SEIS/SEIR regarding the "foreseeable, significant adverse impacts of the

26   selected alternative."  Sharks Mot. at 23.  Sharks Sports alleges that the decision to use tunneling

27

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

*United States District Court*
*Northern District of California*

49

1  methodology to construct the BART extension along Santa Clara Street rather than a "cut and

2  cover" operation was made after the publication of the SEIS/SEIR in 2018.  Compl. ¶¶ 48, 49.

3  The FTA counters that the 2016 Draft SEIS/SEIR and the Final SEIS/SEIR each analyzed both

4  "single-bore and twin-bore tunneling methodologies" as potential options for construction of the

5  BART extension.  FTA Mot. at 25.  The FTA therefore argues that it was proper to analyze both

6  methodological options in the Final SEIS/SEIR and defer to the VTA to select the final option.  *Id.*

7  The Court agrees with the FTA.

8      "NEPA requires supplementation of any NEPA analysis in response to 'significant new

9  circumstances or information relevant to environmental concerns and bearing on the proposed

10  action or its impacts.'"  *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir.

11  2012) (citing 40 C.F.R. § 1502.9(c)(1)(ii)).  Yet "an agency need not supplement an EIS every

12  time new information comes to light after the EIS is finalized."  *Marsh v. Or. Nat. Res. Council*,

13  490 U.S. 360, 373 (1989).

14      Here, the Final SEIS/SEIR presented a detailed description of both the single-bore and

15  twin-bore tunneling methodologies.  FTA 21409–18.  Additionally, the Final SEIS/SEIR

16  discussed adverse effects and mitigation strategies for vehicular traffic, bicyclists, pedestrians, bus

17  traffic, light rail, air quality, construction noise, and socioeconomic impacts under each excavation

18  option.  FTA 20697–99.

19      Because the FTA adequately analyzed both options in the Final SEIS/SEIR, Sharks Sports'

20  arguments that the FTA failed to release information and failed to supplement the Final

21  SEIS/SEIR fail.  Even if the decision of which tunneling method came after the publication of the

22  Final SEIS/SEIR, information regarding the methodologies, possible adverse effects, and

23  mitigation strategies was already available in the record.  NEPA does not require the FTA to re-

24  analyze an option that the FTA already analyzed.  *See Tri-Valley CAREs*, 671 F.3d at 1130

25  ("Because the DOE determined in its supplemental report that the SA did not show a seriously

26  different picture of the likely environmental harms stemming from the proposed project, we must

27

28  Case No. 18-CV-04060-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

50

1    defer to the DOE's finding that a supplemental REA was not required." (internal quotation marks

2    and citation omitted)).  Moreover, Sharks Sports did not respond to the FTA's motion for

3    summary judgment on this issue, thereby seemingly conceding the issue.  *See, e.g.*, *Foster v. City*

4    *of Fresno*, 392 F.Supp.2d 1140, 1147 n.7 (E.D. Cal. 2005) ("At any rate, failure of a party to

5    address a claim in an opposition to a motion for summary judgment may constitute a waiver of

6    that claim.").

7          Accordingly, the Court concludes that the FTA did not violate NEPA by not performing

8    further supplemental analysis.  The Court now turns to Sharks Sports' argument that the Final

9    SEIS/SEIR failed to consider a reasonable range of alternatives.

10         **6.   The SEIS/SEIR Considered a Reasonable Range of Alternatives.**

11         Sharks Sports argues that the FTA, which considered three options in the Final SEIS/SEIR

12   (no project, BART only, and BART & TOJD), did not analyze a "reasonable range" of

13   alternatives.  Sharks Mot. at 23.  The FTA counters that agencies are not required to consider

14   infinite alternatives, and that the fact that the Final SEIS/SEIR is supplemental means that the

15   document incorporates the previous alternatives from earlier environmental reviews, some of

16   which included a parking structure at Diridon Station.  FTA Mot. at 21.

17         Sharks Sports cites *Crenshaw*, 2015 WL 6150847, at *16 (C.D. Cal. Sept. 23, 2015).

18   Sharks Mot. at 23.  In that case, the plaintiff presented a specific alternative that the defendant had

19   not considered in planning its rail project: an "underground alignment" between two streets.

20   *Crenshaw*, 2015 WL 6150847, at *16.  The court addressed the question of "whether the [omitted

21   alternative] was reasonable" and found that the suggested alternative was not reasonable.  *Id.*

22   (citing *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985)).  Here,

23   however, Sharks Sports does not list any specific alternative that should have been considered but

24   was not.

25         NEPA does not require agencies to consider "every conceivable permutation" of a project.

26   *Westlands Water Dist.*, 376 F.3d at 871.  Nor does NEPA require agencies to "discuss

27

28   Case No. 18-CV-04060-LHK
     ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
     MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1  alternatives similar to alternatives actually considered." *Bering Strait Citizens for Responsible*

2  *Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 934, 955 (9th Cir. 2008).  Moreover, Sharks

3  Sports did not respond to the FTA's motion for summary judgment on this issue, thereby

4  seemingly conceding the issue.  *See, e.g.*, *Foster*, 392 F.Supp.2d at 1147 n.7 ("At any rate, failure

5  of a party to address a claim in an opposition to a motion for summary judgment may constitute a

6  waiver of that claim.").

7       Accordingly, the Court concludes that the Final SEIS/SEIR considered a reasonable range

8  of alternatives.

9       **7.  The Final SEIS/SEIR Did Not Violate NEPA or the APA.**

10      In short, the Court concludes that the Final SEIS/SEIR did not violate NEPA or the APA.

11  The Final SEIS/SEIR took a sufficiently "hard look" at each of the parking impacts raised by

12  Sharks Sports.  Moreover, the Final SEIS/SEIR did not violate NEPA's scientific integrity

13  requirement, and the Final SEIS/SEIR adequately disclosed and addressed previous analyses of

14  parking issues.  As to the remaining arguments, Sharks Sports fails to show that the TOJD should

15  have been analyzed under NEPA, that the Final SEIS/SEIR required additional supplementation,

16  and that the Final SEIS/SEIR did not consider a reasonable range of alternatives.  Accordingly,

17  Sharks Sports fails to show that the Final SEIS/SEIR violated NEPA or the APA.

18  **V.      CONCLUSION**

19      For the foregoing reasons, the Court DENIES Sharks Sports' motion for summary

20  judgment.  The Court GRANTS the FTA's motion for summary judgment.

21  **IT IS SO ORDERED.**

22

23

24  Dated: August 8, 2020

25                                              _Lucy H. Koh_

26                                              LUCY H. KOH
                                               United States District Judge

27                                              52

28  Case No. 18-CV-04060-LHK
    ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
    MOTION FOR SUMMARY JUDGMENT